[Cite as *Buzard v. Buzard*, 2012-Ohio-2658.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

| | | |
|---|---|---|
| ROSE BUZARD | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2011 CA 18 |
| v. | : | T.C. NO. 10DR454 |
| GERALD D. BUZARD | : | (Civil appeal from Common Pleas Court, Domestic Relations) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___15th___ day of ___June___, 2012.

. . . . . . . . . .

STACEY R. PAVLATOS, Atty. Reg. No. 0012392, 700 East High Street, Springfield, Ohio 45505
        Attorney for Plaintiff-Appellee

GINO PULITO, Atty. Reg. No. 0037912, 230 Third Street, Suite 200, Elyria, Ohio 44035
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of Gerald Buzard, filed March 25, 2011.  Gerald appeals from the trial court's Entry of February 23, 2011, which (1) overruled his objections to the Magistrate's temporary orders, issued July 27, 2010, pursuant to which Gerald was ordered to pay the outstanding balance due for the care

of his wife, Rose Buzard, at an Alzheimer's treatment facility at the Springfield Masonic Community ("SMC"), as well as her ongoing expenses there; (2) overruled his objections to the Magistrate's decision filed October 7, 2010, in which the Magistrate found Gerald in contempt of the temporary orders; and (3) overruled Gerald's request for findings of fact and conclusions of law as to the Magistrate's decision of October 7, 2010. For the reasons set forth below, we reverse the decision of the trial court.

{¶ 2} On May 6, 2010, Rose filed a Complaint for Divorce against Gerald, in which she alleged that the couple was married on October 16, 1982, and that no children were born of the marriage. On the same date, Rose filed her Motion for Temporary Orders, in which she requested an order requiring Gerald to continue paying her living expenses and rent, temporary spousal support during the pendency of the divorce, and interim attorney fees to allow her to prosecute the divorce.

{¶ 3} Gerald filed an Answer and Counterclaim. In his Counterclaim, Gerald asserted that he and Rose entered into an Antenuptial Agreement ("A.A.") which contains contractual provisions governing the division of property and support in the event of divorce. The A.A. is attached to the Answer and Counterclaim. It is dated October 15, 1982, and it provides in relevant part:

> Whereas, the parties have agreed that neither party shall have any right, title, or interest, or claim in or to the property of the other, either during their marriage or upon the death of the other, and desire to set forth their said agreement.
>
> * * *
>
> 2. Each party is hereby barred from any and all rights, * * * allowance for twelve months support * * * and all other rights or claims

whatsoever, in or to the estate of the other, whether real or personal, and whether now owned or hereafter acquired, which may, in any manner, arise or accrue by virtue of said marriage.

* * *.

**{¶ 4}** Rose answered the counterclaim and asserted as affirmative defenses that the A.A. is void due to fraud at the inception, due to changed circumstances, and because "its enforcement would be unconscionable." Rose further asserted that Gerald committed financial misconduct.

**{¶ 5}** A hearing was held on July 26, 2010, on Rose's Motion for Temporary Orders. Mr. Larry Hofbauer, an attorney representing Rose's daughter and legal guardian, Dawn Koss, testified that Rose was born in 1947. Regarding Rose's assets, Mr. Hofbauer testified that a living trust exists in Rose's name that holds legal title to a residence in Florida. Mr. Hofbauer stated that he has not seen the trust. He further stated that Rose receives Social Security income and has a brokerage account in the amount of "about $2300." According to Mr. Hofbauer, those "are the only [assets] we've been able to find through the guardianship." Mr. Hofbauer testified that Rose's monthly expenses at SMC are "seven thousand and some dollars," and that he applied for Medicaid on behalf of Rose and the application was denied, since there were spendable assets in her brokerage account. According to Mr. Hofbauer, "We needed to identify the current amount in the brokerage account, and they also ask[ed] for a copy of the living trust to determine the status of that property." Mr. Hofbauer testified that he contacted counsel for Gerald to gain information about Rose's living trust but had not received a response. On cross-examination, Mr. Hofbauer testified that he and Dawn were "in the process" of gaining access to Rose's

brokerage account in order "spend down" the amount therein and reapply for Medicaid. Mr. Hofbauer acknowledged that Rose would also be eligible for financial assistance from SMC in the event that she exhausted her assets, but he was unaware if any application to SMC for assistance had been made.

{¶ 6} Gerald testified initially on cross-examination that he is 74 years old, and he currently resides with a caretaker in the residence that is in Rose's trust. According to Gerald, he and Rose moved into an apartment at SMC in October of 1999. He identified a Health Care Center Agreement, dated July 30, 2009, signed by him as Rose's legal representative, which governed Rose's subsequent care at the Alzheimer's treatment facility. The Agreement provides that it is entered into between "Rose Buzard, (the 'Resident') and * * * the Resident's Legal Representative (hereinafter referred to individually and/or collectively as the 'Resident')." Paragraph 9 of the Agreement provides:

> **FINANCIAL ASSISTANCE:** In the event the Resident exhausts his/her own financial resources or otherwise becomes unable to pay any or all of the aforementioned Charges, the Resident shall immediately apply for and obtain all available assistance from the appropriate governmental agencies and/or third parties. Should the amount of remaining financial resources and other assistance be insufficient to pay the Charges of the Community, the Resident may apply to the Community for additional financial consideration and dispensation. The Community will provide such consideration and dispensation if the Resident demonstrates an actual financial need.

Gerald testified that he paid for the cost of Rose's care while he was the administrator of her trust, but "when that changed, it changed the obligations." According to Gerald, as "long

as I was durable power of attorney for her, I paid for it."

{¶ 7}    When Gerald was called on direct examination, the following exchange occurred:

Q.  So there's a brokerage account that has been funded by some insurance that you established through your company?

A.  I gave her about $600,000 to start the trust in the beginning.

* * *

A.  There is nothing in that account now.

Q.  I was going to ask if the trust still had those funds.  What happened to those funds, Mr.  Buzard?

A.  They were used to well, a lot of them, as many of us had, big losses on the stock market during that time, and she lost quite a bit on that.   And then the rest was used of (sic) making house payments.

Q.  Now, there is a house that's titled to the trust; is that correct?

A.  Yes.

Q.  That's the Florida property * * *

A.  Um-hum.

Q.  And can you tell this Court where the funds originated for the acquisition of that property?

* * *

A.  Financed the entire property through Merrell Lynch [in 1999].

* * *

Q.   Since 1999, you said that some of her brokerage account was used for the

payment of this real estate?

Q. Yes.

Q. Has your trust been paying on this real estate?

A. Yes.

Q. And can you tell this Court for approximately how long?

A. Well, I contacted my broker to find out the amount, $225,000 I've paid from that brokerage.

Gerald testified that a mortgage balance of $300,000.00 remains on the home, and that he continues to make the payments. He stated that while Rose's trust holds title to the property, both his and Rose's names are on the mortgage. When asked if there is any equity in the home, Gerald stated that he "tried to sell it for a year, at $600,000, and it didn't sell." He said he and Rose took out a home equity loan to remodel the home, and the total of the mortgage and the loan exceeds $600,000.00. Gerald testified that he is retired, and while he has investments, they produce no income, and he and lives on Social Security income of $1475 a month. According to Gerald, his brokerage account is valued at $350,000.00, "down a million and a half." In addition to his home, Gerald testified he has a mortgage on a boat and "one on the cars."

{¶ 8} Dawn, Rose's daughter, testified that Rose has suffered from Alzheimer's since 2004. According to Rose, Gerald told her in November of 2009 that he intended to move Rose to Florida. According to Dawn, she contacted SMC "and told them what he was planning to do, and asked them not to let him take her out, and they had told me that they couldn't stop him because he was the power of attorney and her husband." Dawn testified that her husband contacted "Ohio Adult Protective Services, who contacted the

Masonic Home, and they filed for guardianship, emergency guardianship." Dawn stated that she eventually became her mother's guardian. Dawn stated that Gerald paid Rose's expenses at SMC until April, 2010. She testified that Rose receives $725.00 a month in Social Security income, and that Dawn has used a portion of that money to reimburse herself $700.00 for the cost of the guardianship attorney, and to purchase clothes for Rose. When asked if she had to apply Rose's income to her expenses at SMC, she responded, "I haven't been told that." Dawn testified that she spent $1875.00 of her own money on Rose's divorce, and she testified that she seeks interim attorney fees from Gerald to cover the divorce, as well as a monthly amount to cover Rose's "incidentals." Dawn testified that she "has never seen the trust, so I don't know what the trust has." Dawn identified Plaintiff's Exhibit B, a statement from SMC, dated July 14, 2010, showing a balance due of $26,696.91 for Rose's care, which includes a charge of $7,440.00 for a private room from July 1, 2010 until July 31, 2010, and a balance forward through May 31, 2010, of $21,736.77. On cross-examination, when asked how Gerald paid for Rose's care, Dawn responded, "[h]e told me he had to take money out of his trust to pay for my mom's care." Finally, regarding the Health Care Center Agreement, Dawn stated, "I don't know what the contract says. I don't understand what it says, honestly."

{¶ 9} The Magistrate's entry of July 27, 2010, is captioned, "Temporary Orders without Children," and it provides, without analysis, "the request for temporary spousal support is denied." If further provides, "Gerald will immediately pay the outstanding balance due for the care provided for Rose" at SMC, and "Gerald will as they come due pay the ongoing expenses for the care of Rose" at SMC.

{¶ 10} On August 17, 2010, Gerald filed a motion for extension of time to file

objections to the magistrate's orders, "for the reason that counsel for Defendant was out of the country from July 28, 2010, until August 9, 2010." Attached is the affidavit of Gerald's counsel. On August 19, 2010, Gerald filed "Defendant's Objections to Decision of Magistrate of July 27, 2010," wherein he asserted five "objections" and argued

> * * * the order of the Magistrate clearly constitutes an abuse of discretion. Had the magistrate relied upon the factors enumerated in R.C. § 3105.18, no support, whether in the form of direct payments to the Plaintiff or payments to a third party, would have been ordered. Defendant has an inability to pay any sort of support. The defendant is elderly with medical problems living on a fixed income derived from retirement funds. Furthermore, while the wife is afflicted with Alzheimer's disease, her contract with [SMC] provides for continued care if no assets are available free of charge. Finally, the parties executed a premarital agreement in which the parties agreed that neither would be obligated for the support of the other spouse.

**{¶ 11}** Rose filed her contempt motion on August 27, 2010. On the same date she opposed's Gerald's motion for an extension of time. In her memorandum in opposition, she argued

> Civ.R. 53(D)(2) speaks to a "Magistrate's Order." An "order" is defined as an order of the Magistrate "necessary to regulate the proceedings and [is] not dispositive of a claim or a defense of a party." * * * The proper procedure to review such an order is for a party to "file a motion with the court to set aside a Magistrate's Order. The motion shall state the moving party's reasons with particularity <u>and shall be filed not later than ten days</u>

<u>after the Magistrate's Order is filed</u>." Accordingly, the Defendant had until August 7, 2010, to file his motion to set aside.

* * *

The Defendant's filing is ineffectual for two (2) reasons. First, the Defendant's filing of objections is procedurally improper to initiate review of the Magistrate's Temporary Orders of July 27, 2010. Secondly, the Defendant's filing for review was delinquent by some twelve (12) days.

{¶ 12} On September 10, 2010, the court issued an "Entry" that set the matter for "a final evidentiary hearing" and further granted Gerald leave "to file his objections which were filed on August 19, 2010, out of time."

{¶ 13} The hearing on Rose's contempt motion was held on October 5, 2010. At the contempt hearing, on cross-examination, Gerald testified that he has not paid for Rose's care at SMC "[s]ince I lost power of attorney, because I don't have control of her money, and I don't have any money myself." Gerald stated that he has an IRA at Stifel Nicolaus, and that as of July 31, 2010, it had a value of $400,000.00. Aside from the IRA, Gerald stated that he has no other liquid assets. Gerald acknowledged that he wrote checks totaling $86,600.00 from his account between January 1, 2010, and July 31, 2010, and that he had not paid the SMC bills. Gerald testified that he paid between $7500.00 and $8000.00 per month for Rose's care.

{¶ 14} Also at the contempt hearing, Dawn identified a bill from SMC, dated September 10, 2010, in the amount of $41,327.59. The following exchange occurred on cross-examination:

Q. Ma'am, you are now acting on behalf of your mother as far as her

assets; is that correct?

A. Yes.

Q. And you're drawing, her Social Security check is coming to you or your attention?

A. Yes.

Q. And my understanding is that you are also going to apply for additional benefits for you mother; is that correct?

A. We did.

Q. And what was the outcome of those additional benefits; have they been awarded?

A. No, it was denied.

Q. And the reason for the denial?

A. We don't have all the financial information.

Q. And how much have you accumulated so far on behalf of your mother?

A. My mom gets $725 a month.

* * *

A. She has received five Social Security checks.

Q. What do you currently hold for her benefit, how much?

A. $906.67.

{¶ 15} On direct examination, Gerald testified that he was paying $4000.00 per month for the home in Florida, along with additional expenses, including interest only on a home equity loan of $278.48, a boat loan payment of $909.35, and two car payments of

$517.84 and $249.88. He stated that in 2009 and 2010, he "was continually taking money out of my retirement fund to pay those bills." Gerald testified that in 2006 he received $18,366 in Social Security benefits, $3,134.00 in ordinary dividends, $63.00 in interest income, and $70,687.00 in distributions from his IRA; in 2007, he received $18,966 in Social Security income, $1,058.00 in ordinary dividends, $53.00 in interest income, and $66,230.00 in distributions from his IRA; in 2008 he received $19,409 in Social Security income, $120.00 in ordinary dividends, $29.00 in interest income, and $98,000.00 in distributions from his IRA. Gerald stated that he had yet not filed his taxes for 2009, but that he received $18,869.40 in Social Security income. Gerald stated that his IRA was valued at "$2 million" in 2000, and that his living expenses and loss in value of some stock reduced the value. He stated that if he continues to deplete his IRA, it will be exhausted in two years, and that he accordingly lacks the ability to pay for Rose's ongoing expenses.

{¶ 16} On October 7, 2010, the trial court issued a decision that provides that the attached decision of the Magistrate is adopted and made a final order of the court. The Magistrate's Decision provides:

> The evidence offered by Gerald to establish a defense to the allegation of contempt was carefully considered by this trier of fact.
>
> The court order itself implies an ability to comply at the time the order was issued. Therefore, the moving party makes a prima facie case of contempt when it is established that the alleged contemnor has not complied with a valid court order. Once the failure to comply is established, the alleged contemnor has the burden of production, of going forward with evidence of an inability to comply. The burden of persuasion, however,

remains with the moving party.

The evidence offered does substantially and credibly establish a prima facie case for contempt.

The evidence offered by Gerald to establish a defense for the noncompliance does not establish a credible and complete defense to the charge of contempt.

Based on the standard of clear and convincing evidence, it is reasonable to conclude as a matter of law that Gerald did violate the court's orders, so as to warrant a finding of contempt and punishment by the court.

The Magistrate found Gerald in contempt, fined him $250.00 and sentenced him to 30 days in jail. The Magistrate suspended the fine and sentence contingent upon Gerald purging the contempt by immediately complying with the temporary orders.

{¶ 17} On October 19, 2010, Gerald filed a request for findings of fact and conclusions of law. On the same day, Gerald filed "Defendant's Objection to Decision of Magistrate of October 7, 2010." According to Gerald, his inability to pay is a valid defense to the finding of contempt. He further asserted that SMC is contractually bound to provide for Rose's care if no assets are available. Gerald noted that, pursuant to the court's decision, there is no limit to his financial obligation to Rose, and he asserted that he will be left unable to care for his own needs. Gerald argued that the court's decision is contradictory in that it found that Rose is not entitled to temporary support yet ordered him to pay for her ongoing care and expenses. Finally, Gerald asserted that the court was required to state a basis for its award of support, pursuant to R.C. 3105.18(C).

{¶ 18} On October 22, 2010, Rose filed a motion to compel Gerald to respond to

her request for production of documents. On the same day, Rose moved the court for an order joining Stifel Nicholas as a party defendant, and for an order enjoining Gerald and Stifel Nicholas from withdrawing or depleting the account Gerald "has on deposit with Stifel Nicholas." In her memorandum in support, Rose asserted that Gerald maintains a trust account with Stifel Nicholas, and that between January 1, 2010 and July 31, 2010, he withdrew "$106,600.00 from that account and has refused to apply those funds to the care of" Rose.

{¶ 19} On November 18, 2010, after a hearing, the court granted Rose's motion to compel and motion to join Stifel Nicholas as a defendant. The court further enjoined Gerald from withdrawing funds from the Stifel Nicholas account in excess of that needed to pay the Citi Mortgage first mortgage (approximately $4,375.15 per month); Bank of America second mortgage (approximately $287.02 per month); Bank of America boat loan (approximately $909.35 per month); Volkswagon Credit (approximately $249.88 per month); and Huntington Bank lease payments for the Lincoln (approximately $517.85 per month), or a total of $6,339.25 in any calendar month.

{¶ 20} On February 15, 2011, the court conducted a hearing on Gerald's objections. In its Entry of February 23, 2011, after noting that it "conducted a de novo review of all prior pleadings and Orders filed in the within matter as well as the transcript of the hearings which took place before the Magistrate on July 26, 2010 and October 5, 2010," as well as all exhibits that were admitted into evidence, the court first addressed Gerald's objections filed August 19, 2010.

{¶ 21} Regarding Gerald's assertion that the Magistrate abused its discretion by failing to consider the factors enumerated in R.C. 3105.18, the court rejected Gerald's

arguments as follows:

> The statute referred to by the Defendant in this branch of his Objection * * * refers to the issue of spousal support and the factors relating thereto. The Magistrate did not issue an Order for spousal support in his temporary orders filed July 27, 2010, rather, he ordered Mr. Buzard to pay the outstanding balance due for the care of his wife and the future bills incurred for her care as they come due through [SMC] * * * where she presently resides. The Magistrate's Orders are temporary orders and, as such, it is not necessary for the Magistrate to articulate findings of fact or conclusions of law.

{¶ 22} Regarding Gerald's second objection, the court determined that it "disagrees with the defendant's contention that the Magistrate's Orders are, in fact, contrary to the manifest weight of the evidence, and accordingly, this Court finds that Branch Two of his Objections is not well taken." Regarding Gerald's third objection, the court determined that it "disagrees with Defendant's contentions that he has an inability to pay Plaintiff's living expenses * * * ." As to Gerald's fourth objection, the court determined, "this Court disagrees with the Defendant's contention relating to this Branch which suggests that Ms. Buzard lacks a need for temporary support in this case, * * *." Finally, regarding Gerald's fifth objection, the court determined, after it reviewed the A.A., that "there is nothing in the Magistrate's temporary orders of July 27, 2010 which is contrary to the parties' pre-marital agreement or, more importantly, contrary to law." The court then overruled each objection. It further determined that "the Magistrate's Temporary Orders filed July 27, 2010 shall remain in full force and effect during the pendency of this matter and until further Order of this Court."

**{¶ 23}** The court next addressed Gerald's objections filed on October 13, 2010, and it noted that it considered the transcript of the contempt hearing that occurred on October 5, 2010. Again, the court determined that the Magistrate's decision did not constitute an abuse of discretion and was not against the manifest weight of the evidence. The court rejected Gerald's assertion that he has an inability to comply with the court's order regarding the payment of Rose's expenses. Finally, the court found that Gerald was not entitled to specific findings under R.C. 3105.18, since the court did not issue an order for spousal support.

**{¶ 24}** Regarding Gerald's request for findings of fact and conclusions of law, the court determined, upon an independent review of the Magistrate's decision, "it is clear to the Court that the Magistrate, in his Decision filed on [October 7,2010] already has made sufficient findings of fact and conclusions of law and that both the Findings and Conclusions of the Magistrate are consistent with the evidence presented at the hearing before him." Finally, the Entry provides "that the Magistrate's Decision filed October 7, 2010 is approved by this Court and adopted by this Court as a possible final appealable order."

**{¶ 25}** Gerald asserts four assignments of error, which we will consider together. They are as follows:

> I. THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY ORDERING GERALD BUZARD TO PAY THE OUTSTANDING BALANCE DUE FOR THE CARE PROVIDED FOR ROSE BUZARD AT [SMC] AS WELL AS THE ONGOING EXPENSES FOR HER CARE AT THE FACILITY.

A.   THE TRIAL COURT ERRED IN CONCLUDING THAT THE ORDER TO PAY THE OUTSTANDING BALANCE DUE AND ALL CONTINUING EXPENSES AT [SMC] DID NOT VIOLATE THE [A.A.]

B.   GERALD BUZARD LACKS THE ABILITY TO PAY FOR THE CONTINUED SUPPORT OF ROSE BUZARD AT [SMC]

C.   ROSE BUZARD DOES NOT NEED THE SUPPORT OF GERALD BUZARD TO PAY HER EXPENSES.

And,

II.   THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY FINDING GERALD BUZARD IN CONTEMPT OF ITS PRIOR COURT ORDER.

A.   GERALD BUZARD LACKS THE ABILITY TO COMPLY WITH THE PRIOR COURT ORDER.

B.   THE UNDERLYING COURT ORDER WAS NOT A VALID COURT ORDER.

And,

III.   THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW BY FAILING TO COMPLY WITH THE FACTORS ENUMERATED IN OHIO REVISED CODE § 3105.18(c)(1) IN AWARDING SPOUSAL SUPPORT.

And,

IV.   THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW BY FAILING TO COMPLY WITH THE

FACTORS ENUMERATED IN OHIO REVISED CODE § 3105.171.

{¶ 26} According to Gerald, Ohio public policy allows the enforcement of prenuptial agreements, the language of the A.A. is clear and unambiguous, and the trial court "failed to either acknowledge the existence of the valid [A.A.] between the parties or to provide any analysis as to its inapplicability." Gerald asserts that when he was paying for Rose's care as well as his own expenses, his monthly expenses exceeded $20,000.00, and that in 2009 he received less than that amount from Social Security. Gerald argues that Rose's continued care "was assured under the contract once her own assets were exhausted," and that the amount in her brokerage account would have been exhausted in less than a month. Gerald asserts that his inability to pay Rose's expenses does not support a finding of contempt, and that the Temporary Orders are invalid, pursuant to the A.A. Gerald further directs our attention to the factors set forth in R.C. 3105.18(C)(1), which govern an award of spousal support. Finally, Gerald directs our attention to the factors set forth in R.C. 3105.171, which govern the division of marital property, and he argues that the trial court failed to make an equitable division of marital debt.

{¶ 27} We will first review the relevant law, and we will then discuss the reasons for our reversal of the trial court's decision.

{¶ 28} As this Court has previously determined:

An order that makes a finding of contempt and imposes a sanction or penalty is a final appealable order. * * * "Where a non-appealable interlocutory order results in a judgment of contempt, including fine or imprisonment, such a judgment is a final and appealable order and presents to the appellate court for review the propriety of the interlocutory order which is

the underlying basis for the contempt adjudication." * * * *Kuhn & Co. v. Genslinger*, 2d Dist. Montgomery No. 12786, 1992 WL 157717, * 10 (July 8, 1992).

**{¶ 29}** Civ.R. 75(N)(1) provides:

When requested in the complaint, answer, or counterclaim, or by motion served with the pleading, upon satisfactory proof by affidavit duly filed with the clerk of court, the court or magistrate, without oral hearing and for good cause shown, may grant spousal support pendente lite to either of the parties for the party's sustenance and expenses during the suit * * *.

**{¶ 30}** "Courts are entrusted with immense discretion in determining the appropriate amount of temporary support to be awarded a spouse. * * * Hence, our review of the propriety of the amount of temporary support awarded is limited to ascertaining whether the trial court abused is discretion." *Office v. Office*, 2d Dist. Montgomery No. 15298, 1997 WL 18043, * 6 (Jan. 17, 1997). As the Supreme Court of Ohio has determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that

would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 31} R.C. 3105.18 governs the award of temporary spousal support and provides that during the pendency of any divorce, the court may award "reasonable" temporary spousal support to either party. This Court has determined:

> In determining whether spousal support is appropriate and reasonable, the court should consider, among others, the following factors: the spouse's ability to pay, the dependent spouse's need, and the standard of living that the parties maintained during their marriage. * * * None of these factors are necessarily determinative; the court's decision should be based upon the facts and circumstances of the particular case. * * * ]T]he priority of the court should be to ensure that the purpose of awarding temporary spousal support is furthered.

> The purpose of awarding temporary spousal support is not given expression in R.C. 3105.18. Nevertheless, courts have acknowledged that the clear aim of temporary spousal support is to preserve the status quo during the divorce proceedings. * * * A party's "need" is relative to the particular individual involved and the facts and circumstances of the case. * * *. *Office*, * 7.

We note that the factors that Gerald cites, that are set forth in R.C. 3105.18 (C)(1), govern whether an award of spousal support, and not temporary spousal support during the pendency of divorce, is appropriate, and the R.C. 3105.18(C)(1) factors accordingly have no application to Rose's temporary orders.

{¶ 32}  Regarding R.C. 3105.171(F), a trial court enjoys broad discretion when dividing marital property.  *Heineman v.  Manemann, 2*d Dist. Clark No. 2000 CA 76, 2001 WL 395687, *1 (April 20, 2001).  R.C. 3105.171(F) provides: In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

* * *

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

Since the court, as Gerald asserts, pursuant to R.C. 3105.171(F)(2), must consider both the

parties' assets and liabilities, "an equitable division of marital property necessarily implicates an equitable division of marital debt." *Elliott v. Elliott*, 4th Dist. Ross No. 05CA2823, 2005-Ohio-5405, ¶ 16.

**{¶ 33}** As Gerald further asserts, "[i]t is well settled in Ohio that public policy allows the enforcement of prenuptial agreements." *Johnson v. Johnson*, 2d Dist. Miami No. 2010 CA 2, 2011-Ohio-500, ¶ 10. According to the Ohio Supreme Court:

"Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross v. Gross* (1984), 11 Ohio St.3d 99, 464 N.E.2d 500, paragraph two of the syllabus. Although a prenuptial agreement must meet these three "special" conditions, in all other respects, prenuptial agreements are contracts, and the law of contracts will generally apply to their application and interpretation. * * * We will affirm a trial court's interpretation of such a contract if the record contains competent evidence to support it. * * * .

The primary role of the court in reviewing a contract is to ascertain and give effect to the intent of the parties. * * * A contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract. * * *. *Johnson*, ¶ 10-11.

**{¶ 34}** Additionally, "[a] trial court's finding of contempt will not be disturbed on

appeal absent an abuse of discretion." *Schaefer v. Schaefer*, 2d Dist. Greene No. 03CA0085, 2004-Ohio-2956, ¶ 17. "Contempt lies only when it is within the contemnor's power to perform the act prescribed by the court order and he fails to do so." Id., ¶ 18.

**{¶ 35}** Finally, regarding Gerald's assertions that the issuance of the Temporary Orders and the finding of contempt pursuant thereto are against the manifest weight of the evidence, we are "guided by the statement that 'judgments supported by some competent, credible evidence going to all the essential elements of the case will not reversed by a reviewing court as being against the manifest weight of the evidence." *Thomas v. Barnhouse,* 2d Dist. Clark No. 2003-CA-22, 2004-Ohio-77, ¶ 18. Further, "we must presume the findings of the trial court are correct because the trial judge is best able to observe the witnesses and use those observations in weighing the credibility of the testimony. * * *." *Id.*

**{¶ 36}** We initially note, as Gerald asserted below, that the "Temporary Orders" are internally inconsistent. While they purport to deny Rose temporary spousal support, the orders in fact award her temporary support in the form of the payment of her "ongoing expenses" at SMC. The trial court repeated the Magistrate's error when it found that "the Magistrate did not issue an Order for spousal support." We further note that Gerald paid SMC until March, 2010, Rose filed for divorce in May, 2010, and at the time of the Temporary Orders hearing in July, 2010, the balance due to SMC was $26,696.91; the "Temporary Orders" improperly effect a property division by directing Gerald to pay marital debt in the form of the outstanding balance due. Since Gerald asserts he cannot cover Rose's bills with his limited income, unless he takes distributions from his IRA account, we cannot conclude that the temporary orders represent an "equitable division of marital

debt."

{¶ 37}   Also, under the facts and circumstances of this case, when we consider Gerald's limited fixed income and diminishing IRA, along with the  language of paragraph 9 of the Health Care Center Agreement, which provides that Rose, if she "demonstrates an actual financial need," may receive financial assistance (application for which had not been made at the time of the Temporary Orders hearing), we cannot conclude that the trial court properly considered Gerald's ability to pay, or Rose's need, and we accordingly cannot conclude that Temporary Orders standing alone are reasonable.

{¶ 38}   Beyond the Temporary Orders, while a trial court "may award temporary support during the pendency of a divorce action pursuant to R.C. 3105.18 despite the existence of an antenuptial agreement to the contrary,"[1] there is no indication that the Magistrate even considered the A.A. in issuing the Temporary Orders.  Further, as Gerald asserts, the trial court's determination, that "there is nothing in the [Temporary Orders] which is contrary to the parties' pre-marital agreement," is belied by the plain contractual language of the A.A., which reflects the parties' intent and provides that both parties are barred from any and all allowance for support from the other.

{¶ 39}   Based upon the foregoing review of the propriety of the underlying Temporary Orders, and the resulting finding of contempt, we conclude that the Temporary Orders are unreasonable and accordingly invalid.  In other words, an abuse of discretion is demonstrated justifying reversal of the trial court's decison.  Further, the Temporary Orders, and the finding of contempt, are not support by competent, credible evidence and are

---

[1]*Cangemi v. Cangemi*, 8th Dist. Cuyahoga No. 86670, 2006-Ohio-2879, ¶14.

accordingly against the manifest weight of the evidence. Accordingly, the judgment of the trial court is reversed.

. . . . . . . . . .

GRADY, P.J., concurring:

{¶ 40} The determinative issue in the present case is whether the trial court abused its discretion in ordering Gerald Buzard to pay Rose Buzard's expenses for her nursing home care during the pendency of the divorce action.

{¶ 41} Civ.R. 75(N)(1) authorizes the domestic relations court to "grant spousal support pendente lite to either of the parties for the party's sustenance and expenses during the suit" for divorce. The same relief is authorized by R.C. 3105.18(B). The purpose of the award is to preserve the status quo during the divorce proceeding. *Kahn v. Kahn*, 42 Ohio App.3d, 61, 68, 536 N.E.2d 678 (1987). In making the award, the court is not required to consider the factors in R.C. 3105.18(C), and is required only to award an amount of temporary spousal support which is reasonable. *Zeefe v. Zeefe*, 125 Ohio App.3d 600, 709 N.E.2d 208 (8th Dist. 1998). A party who objects to an award of temporary spousal support must show that the award is unreasonable, arbitrary, or unconscionable. *Kahn*.

{¶ 42} In their antenuptial agreement, Gerald and Rose each waived "any right, title, or interest, or claim to the property of the other, either during their marriage or upon the death of the other," and further agreed that "[e]ach party is barred from any and all rights . . . and all other rights or claims whatsoever, in or to the estate of the other . . . which may, in any manner, arise or accrue by virtue of said marriage." Because the temporary support the court ordered Gerald to pay for Rose's benefit necessarily must be from Gerald's property, the terms of the antenuptial agreement bar Rose's right to the relief the court ordered.

**{¶ 43}** The majority, at ¶ 38, cites the holding in *Cangemi v. Cangemi*, 8th Dist. Cuyahoga No. 86670, 2006-Ohio-2879, ¶ 14, that "a trial court may award temporary support during the pendency of a divorce action pursuant to R.C. 3105.18 despite the existence of an antenuptial agreement to the contrary." The Eighth District did not state its reasons for so concluding. Instead, it cited two decisions of the Ninth District Court of Appeals: *Mulvey v. Mulvey,* 9th Dist. Summit App. No. 17707, 1996 WL 724759 (Dec. 4, 1996) and *Fields v. Fields*, 9th Dist. Summit App. No. 15235, 1992 WL 74207 (April 8, 1992).

**{¶ 44}** In *Mulvey*, the trial court applied a credit in the amount of one-half the amount of a marital debt the husband had paid against the husband's promise in the parties' antenuptial agreement to pay the wife, and the wife's agreement to accept, $100,000 "in full satisfaction and discharge of all claims, debts, demands, actions or causes of action whatsoever . . ." The appellate court agreed that because the marital debt represented a joint tax liability, it was equitable that the parties each pay half, entitling the husband to the credit against his $100,000 obligation.

**{¶ 45}** In *Fields*, the parties' antenuptial agreement provided that property division payments to which the wife was entitled were in lieu of her right to any spousal support. The domestic relations court nevertheless ordered the husband to pay the wife's credit card debt as temporary spousal support. The appellate court found no abuse of discretion, writing:

> Temporary spousal support, by the very terms of R.C. 3105.18 can be awarded "[d]uring the pendency of any divorce." Richard filed his original complaint on July 26, 1989. The divorce was not granted until July 3, 1991.

The antenuptial agreement did not provide Deborah with any distribution from Richard until "either party procure[d] a decree of divorce * * *." Thus, according to the agreement, Deborah would receive nothing during this two-year period. Even antenuptial agreements which do provide for spousal support must be conscionable at the time of the divorce or separation. *Gross, supra,* at 109. Unconscionability can be found in a number of circumstances including a changed standard of living occasioned by the marriage, where a return to the prior living standard would work a hardship on the spouse. *Id.* at n. 11.

{¶ 46} In *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.3d 500 (1984), which *Fields* cited, the Supreme Court held that on a judicial review, provisions in a separation agreement "setting forth maintenance or sustenance alimony must meet the additional test of conscionability at the time of the divorce or separation." *Id.*, paragraph four of the Syllabus by the Court. *Gross* also held, at paragraph two of the Syllabus:

Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce.

{¶ 47} The principles set out in *Gross* were subsequently affirmed in *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 628 N.E.2d 1343 (1994), in which the Supreme Court explained: "These conditions precedent to the enforcement of a prenuptial agreement arise in part from the fact that the parties who have agreed to marry stand in a fiduciary relationship

to each other." *Id*., at 466.

**{¶ 48}** In the present case, and unlike in *Mulvey* and *Fields*, the record fails to portray any equitable exception to the terms of the parties' antenuptial agreement that would permit the court to order temporary spousal support. Neither did the court set aside the agreement on the analysis in *Gross* and *Fletcher*. Instead, the court merely assumed that the authority conferred by Civ.R. 75(N)(1) and R.C. 3105.18(B) supersedes the conflicting provisions of the parties' antenuptial agreement. However, the law does not so hold.

**{¶ 49}** The parties to an antenuptial agreement, which is a contract, are assumed to have considered their future needs in relation to the marital rights which they waived. Temporary spousal support, or sustenance alimony, is awarded on the basis of the obligee's need and the obligor's ability to pay. *Norton v. Norton*, 111 Ohio St.262, 145 N.E.2d 253 (1924). Absent one of the impediments identified in *Gross*, the agreement is enforceable, and is not superseded by Civ.R. 75(N)(1) or R.C. 3105.18(B) to allow the domestic relations court to order relief which the agreement prohibits. The domestic relations court abused its discretion in ordering temporary spousal support without a finding that one of the *Gross* exceptions to enforceability applies.

. . . . . . . . . .

HALL, J., concurs with the opinion of Judge Donovan, and the concurring opinion of Judge Grady.

. . . . . . . . . .

Copies mailed to:

Stacey R. Pavlatos
Gino Pulito
Hon. Thomas J. Capper