[Cite as *Bohme v. Bohme*, 2015-Ohio-339.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

MICHELLE H. BOHME                     :

    Plaintiff-Appellee/              :          C.A. CASE NO.    26021
    Cross-Appellant

v.                                    :          T.C. NO.    09DR1281

RICHARD K. BOHME                      :           (Civil appeal from Common
                                                   Pleas Court, Domestic Relations)

    Defendant-Appellant/            :
    Cross-Appellee

                                      :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the 30th day of January. 2015.

· · · · · · · · · ·

DAVID M. McNAMEE, Atty. Reg. No. 0068582, 42 Woodcroft Trail, Suite D, Beavercreek, Ohio 45430
    Attorney for Plaintiff-Appellee/Cross-Appellant

KEITH R. KEARNEY, Atty. Reg. No. 003191 and AMY R. BLAIR, Atty. Reg. No. 0073760, 2160 Kettering Tower, Dayton, Ohio 45423
    Attorneys for Defendant-Appellant/Cross-Appellee

· · · · · · · · · ·

HALL, J.

{¶ 1}  This matter is before the Court on the Notices of Appeal of Richard K. Bohme, filed December 11, 2013, and Michelle Ann Hanley, filed December 17, 2013.  The parties appeal from their November 20, 2013 Final Judgment and Decree of Divorce.

{¶ 2}  The record reflects that the parties were married on August 19, 1989, in Cincinnati, Ohio, and that two children were born as issue of the marriage, namely A.B., born January 27, 1995, and K.B., born September 20, 2000.  Michelle filed a complaint for divorce on December 3, 2009, and Richard filed an Answer and Counterclaim for Divorce on December 15, 2009.

{¶ 3}  On January 4, 2010, the court issued a temporary order requiring Richard to pay $750.00 per month in temporary spousal support, commencing on January 5, 2010, as well as monthly housing spousal support in the amount of $6,446.00, commencing December 1, 2009.  On March 5, 2010, an Amended Temporary Order was issued.

{¶ 4}  Pursuant to an April 28, 2010 Agreed Order and Entry for Temporary Custody, Child Support and Spousal Support, Richard was ordered to pay temporary child support in the amount of $672.00 per month per child as well as temporary spousal support to Michelle in the amount of $2,250.00 per month, effective March 26, 2010.  The Agreed Entry further granted Michelle exclusive use of the marital residence and required Richard to pay "the first and second mortgage (including real estate taxes and insurance) and basic utilities (including gas, electric, water, sewer, trash, basic phone, and cable) and housecleaning and lawn care for the marital residence."  Finally, Richard was ordered to make the car payments for Michelle's BMW and Volvo, and to pay the automobile insurance for the vehicles.

{¶ 5}    Trial was held on July 18, 19, and 20, 2012.  Michelle filed a Post Trial Brief on August 30, 2012, and Richard did so on August 31, 2012.    On February 21, 2013, Michelle filed Plaintiff's Supplement to Post Trial Brief, and Richard filed Defendant's Memorandum in Response to Plaintiff's Supplement to Post Trial Brief; Defendant's Motion to Strike on March 15, 2013.   The trial court issued a Decision on May 13, 2013. The Decision provides in relevant part as follows:

## VALUE OF THE RICHARD BOHME, DDS, INC. BUSINESS

Richard is a dentist and owns his own practice.  Three separate experts testified on the fair market value of the practice for purposes of dividing it as a marital asset.   There is no dispute that the dental practice is a marital asset. Richard became a dentist after the parties' marriage and continued to operate as a dentist throughout the parties' marriage.

Milton Zimmerman testified on behalf of Richard in this matter.  Mr. Zimmerman testified that his belief was that the fair market value of the dental practice is $240,000.00.  Mr Zimmerman testified that he used a market-based approach in order to arrive at this figure.  Mr. Zimmerman acknowledged that Richard is a client of the firm that he formerly was a principal of and that Richard still owes that firm money.

Mr. Zimmerman indicated that he is presently employed by an entity known as Practice Impact and that he has been involved with the sale of numerous dental practices.

Mr. Zimmerman testified that he is not a CPA nor does he have any

certifications regarding the valuations of businesses.

J.R. Hochwalt also testified in this matter. Mr. Hochwalt testified that he was initially retained by Richard to provide a fair market value of the practice as of December 31, 2009. Mr. Hochwalt found that the fair market value of the practice as of that date was $689,600.00. Mr. Hochwalt testified that he used the income method to arrive at this figure and further discounted that number by an additional 30% because of a marketability discount. Mr. Hochwalt indicated that what he meant by a marketability discount was the time it takes to sell the business, the recent loss of General Motors and Delphi clients by the dental practice, and various other factors.

Mr. Hochwalt further opined that if indeed the practice had declined by 14% since 2009, if he were doing a report now, he would reduce the fair market value of the dental practice to $500,000.00.

Mr. Hochwalt has an ABV [Accredited in Business Valuations] and is a Certified Public Account.

Alan Duvall testified in this matter on behalf of Michelle. Mr. Duvall indicated that the appraisal was very difficult in this instance because of the nature of the documents. Mr. Duvall indicated that there was confusing information within the documents and the documents themselves were confusing.

Mr. Duvall used the Capitalized Earnings Method and also incorporated the Cash Flow Method in arriving at his fair market value. Mr. Duvall arrived at a figure of $1,137,000.00 as and for the fair market value of Richard's dental

practice. Mr. Duvall attributes the difference between his value and Mr. Hochwalt's due to Mr. Duvall not believing that a marketability discount was appropriate in this instance. Mr. Duvall opined that as a result of Richard being the sole owner of the business, he has absolute control, and this reduces the marketability discount. Additionally, Mr. Duvall indicated that the lack of marketability is built into the capitalization rate, and as a result, he did not feel applying a marketability discount was appropriate in this instance. Additionally, Mr. Duvall testified that Richard has taken excessive distributions out of the business and that this would clearly impact the fair market values indicated by the two other experts in this matter.

Additionally, during the course of testimony, it was learned that in 2008, Richard had his practice listed for sale in the amount of $1,100,000.00.

The court finds that the fair market value of Richard's dental practice is $689,600.00 as of December 31, 2009. The court finds the testimony by Mr. Hochwalt to be credible in this matter. The court finds that it is appropriate to use a marketability discount in this situation, and as a result, finds the value of $689,600.00 to be representative of the fair market value of the dental practice.

* * *

**PAYMENT OF MARITAL RESIDENCE EXPENSES**

The parties own a residence at 10678 Chestnut Lane in Dayton, Ohio. Richard testified that he initially moved out of the residence in February of 2010.

* * *

Richard testified that somewhere in [August] of 2011, Michelle vacated the residence on Chestnut Hill Lane. Richard testified that he was not aware that she was leaving the home until she had actually moved out. Richard testified that Michelle then asked him to move back into the Chestnut Hill Lane address, which he was unwilling to do.

Michelle testified that she moved out of the residence because she had surgery performed and it was difficult to move about the house. Additionally, she testified that she was unable to adequately care for the house and could not afford the repairs associated with the house.

In May of 2011, Richard purchased his own home and Richard denies that Michelle ever asked him to move back into the Chestnut Hill Lane residence.

Richard testified that upon regaining possession of the Chestnut Hill Lane residence, he discovered it had been left in horrendous shape. Richard testified that numerous items of property had been left behind. The property was unkept, and in fact, Richard found dog urine stains on the carpet and it took him approximately two months to clean up the property.

* * *

The court finds that Richard provided the court with documentation evidencing expenses at the marital residence at Chestnut Hill Lane in the amount of $77,068.00. The court finds that these expenses were a marital debt, and therefore, shall be shared equally between the parties. Michelle chose to vacate the Chestnut Hill Lane residence * * *. As a result of that action, the parties were

then forced to have three mortgage/rent payments. Richard incurred additional expenses in order to prepare the Chestnut Hill Lane address in an appropriate manner to be sold.

* * *

### SPOUSAL SUPPORT

Michelle is presently unemployed and was last gainfully employed in 1994. Michelle graduated from Miami University and for a period of time was a corporate trainer. Michelle acknowledges that she has on occasion worked for Richard at his office but has not engaged in any gainful employment since 1994.

Michelle is considering returning back to school to either obtain an MBA or a Law Degree. Michelle testified that her employment skills are no longer viable and before she could obtain gainful employment, she would need to go back to school.

Michelle was 46 years of age at the time of the hearing and is in good physical and mental health.

Michelle testified that the parties lived an extravagant lifestyle during the course of their marriage. Michelle testified that the parties belonged to private clubs, private pools, and purchased only designer clothing and top quality items. Michelle also testified that the parties traveled overseas extensively.

* * * Michelle testified that she is requesting $11,000.00 per month in spousal support. Michelle listed on her Affidavit of Financial Disclosure monthly expenses of $9,158.00. Included in these expenses were things such as

groceries in the amount of $2,250.00 monthly, gas in the amount of $1,200.00 monthly, and car repairs in the amount of $750.00 monthly. Michelle also listed housing expenses under the "other" category of $1,150.00.

* * * Richard is 46 years of age and is in good physical health and mental health. Richard testified it is his belief that Michelle greatly exaggerated the life style that the parties experienced during the course of their marriage. * * *

On Richard's original Affidavit of Financial Disclosure, he listed his annual income as $424,096.00.

Richard testified that he pays himself an annual salary of $212,000.00 through his corporation. Richard believes that this should be the income figure used to determine his child support and spousal support obligations.

The three experts that testified regarding the business valuation also testified as to Richard's actual income.

Mr. Duvall testified that he believes Richard has annual income available to him through his dental practice in the amount of $520,000.00. Mr. Duvall examined Richard's business records and felt that in 2011 he had personal cash flow in the amount of $521,000.00.

J.R. Hochwalt testified that Richard's annual income for 2009 was $516,468.00 and for 2008 was $463,921.00. However, Mr. Hochwalt testified that he does not believe that Richard is taking home the corporate net income. Mr. Hochwalt suggested using an annual income of $260,190.00 for purposes of spousal support. Mr. Hochwalt opined that essentially it would be

double-dipping to use the $500,000.00 figure as income for Richard for purposes of calculating spousal support because that income figure was used in valuing the business of which Michelle is going to receive her share, and therefore, should not be used in calculating spousal support.

Mr. Zimmerman testified that the annual figure that should be used for the purposes of calculating spousal support should be $215,000.00. Mr. Zimmerman testified that this $215,000.00 is not generated by Richard's ownership interest, but rather as Richard as an employee. Mr. Zimmerman states that the rest of the income is a result of Richard's entrepreneurial spirit and that is part of the valuation of the dental practice and should not be used in calculating spousal support.

After having considered the statutory factors in O.R.C. § 3105.18(C), the testimony of the parties, their credibility and demeanor, the court finds that Richard shall pay Michelle $9,000.00 per month as and for spousal support for the period of seven years, effective with the Final Judgment and Decree of Divorce in this matter. Although Michelle is a college graduate, she has not been in the workplace for a considerable period of time, and as a result, Michelle needs to obtain additional skills in order to make her employable. The court has arrived at this figure by finding that Richard has annual income of approximately $500,000.00 and the court has imputed income to Michelle in the approximate amount of $17,000.00. Said spousal support shall be subject to the continuing jurisdiction of the court as to both amount and duration.

* * *

**ATTORNEY FEES**

Michelle is requesting that Richard pay all of her attorney fees in this matter.

Richard is requesting that Michelle be required to reimburse him for all the attorney fees associated with the sale of the house on Chestnut Hill Lane. Richard contends that Michelle was [an] obstructionist in regard to the sale, and as a result, he should be reimbursed for the attorney fees that he has incurred.

The court finds that neither party has engaged in any behavior that would warrant the award of attorney fees from one to the other. The court also finds that after the divorce, both parties will have sufficient income and assets to be responsible for their own attorney fees.

**{¶ 6}** The Final Decree in relevant part provides as follows:

**CONTESTED ISSUES**

**10. RICHARD BOHME, DDS, INC.**

The Court finds that Richard is the owner of 100% of the outstanding shares of Richard Bohme, DDS, Inc. ("Dental Practice"), through which he practices dentistry. The Court finds that the Dental Practice is a marital asset, that its fair market value is $689,600, and that Michelle is entitled to $344,800 as and for her share thereof. Richard has the option of obtaining a loan and paying Michelle this balance ($344,800) within 120 days of the filing of this Final Judgment and Decree of Divorce. If Richard is unable to obtain a loan, he will

extinguish Michelle's share of the dental practice by making payments to Michelle of $5,800 monthly, until such time as Michelle's marital portion totaling $344,800 is paid off. In addition, if Richard exercises this option, Michelle is entitled to interest at the present judgment rate of 3% during the course of the payments. Further, the $344,800 will be reduced by other offsets, which Richard is entitled to, as set forth in item 22, below.

## 11. DEBT ASSOCIATED WITH BANK OF AMERICA CREDIT CARD

The parties have a credit card with Bank of America with an outstanding balance of $28,000. The Court finds that Michelle shall be responsible for the $15,000 that she charged on the Bank of America credit card that is attributable to her attorney fees with Attorney Phyllis Bossin. Michelle shall hold Richard harmless and blameless thereon. Additionally, Richard shall be solely responsible for the $5,000 fee associated with the credit card for his attorney fees to F. Ann Crossman. Richard shall hold Michelle harmless and blameless thereon. The parties shall be equally responsible for the remaining $8,000 to $9,000 balance on the credit card.

## 12. GOLD BULLION/UBS ACCOUNT

The Court finds that the proceeds in the UBS account and the gold bullion are marital assets. The Court further orders that the gold bullion be sold and the UBS Account liquidated to pay off any costs associated with the marital residence within 30 days of the filing of the Final Judgment and Decree of Divorce.

## 13.  PAYMENT OF MARITAL RESIDENCE EXPENSES

At the time of trial, the parties owned the residence located at 10678 Chestnut Hill Lane, Dayton, Ohio ("Marital Residence").   After the final hearing, the parties sold the Marital Residence via a "short sale"[.]    [T]he court finds that Richard paid $77,068 in expenses associated with the Marital Residence, which expenditure the Court deems to be a marital debt to be shared equally between the parties.   Richard incurred additional expenses in order to prepare the Marital Residence in an appropriate manner to be sold (see item 22, below).   Any expenses that Richard incurred for the Marital Residence after the date of the final hearing (July 19, 2012) shall be equally divided between the parties.   Any losses or costs associated with the sale of the Marital Residence shall be equally divided between the parties.   This includes any tax consequences associated with the short sale.   If there is a deficiency as a result of the sale of the Marital Residence, the parties shall be equally responsible therefore.

## 14.  SPOUSAL SUPPORT

Richard shall pay to Michelle as and for spousal support the sum of $9,000 per month for a period of seven years, commencing with the filing of this Final Judgment and Decree of Divorce.   To arrive at this amount, the Court finds Richard's annual income to be approximately $500,000; and has imputed an annual income to Michelle of $17,000.   Said spousal support shall be subject to the continuing jurisdiction of the court as to both amount and duration. * * * .

* * *

### 19.  TAX EXEMPTIONS

Michelle shall be entitled to claim the minor child, [K.B.] as a tax dependency exemption for all purposes under federal, state and local tax laws in all odd-numbered years, commencing with the year 2013.  Richard shall be entitled to claim the minor child  [K.B.] as a tax dependency exemption for all purposes under federal, state and local tax laws in all even-numbered years.

Richard's right to claim the child as a tax dependency exemption in any year shall be specifically contingent upon his being current in his child support obligations at the end of the year in which he seeks to utilize said election, current being defined as no more in arrears than 30 days in support at the end of the year in which he seeks to claims said election.

### 22.  OTHER OFFSETS AGAINST PROPERTY SETTLEMENT

The Court finds that Richard incurred $77,068 in expenses associated with the marital residence and set forth in Exhibits TT and UU, which are incorporated in this Decree (see item 13, above).  The Court hereby grants Richard an offset against the property settlement that he owes to Michelle in the amount of $38,534, representing one-half of the $77,068.  Other offsets to which Richard is entitled are:

a) $30,000 cash advanced (see item 9, above)[1]

b) $15,000 on the Bank of America credit card (see item 11, above)

---

[1] **9.  ADVANCE OF MONEY**

Richard advanced $30,000 to Michelle prior to the final hearing in this matter.  Said $30,000 shall serve as an offset against the property settlement owed by Richard to Michelle (see item 22, below).

c) $4,200 representing one-half of the remaining balance on the Bank of America credit card (see item 12, above)[.] Richard shall be responsible to pay the Bank of America credit card debt and shall hold Michelle harmless thereon.

As a result of the foregoing, the property-settlement amount that Richard shall pay Michelle (after the above offsets are deducted) is $257,066. However, that amount will be further reduced by the offsets listed below, which are not ascertainable as this time:

d) one-half of all mortgage payments made toward the marital residence from August 2012 through the sale of the marital residence

e) one-half of the real estate taxes and utilities paid for the marital residence for the above mentioned dates

f) one-half of any other expenses associated with the sale of the marital residence

g) one-half of any payments made by Richard to satisfy any shortfall on the mortgage obligation that was not met by the proceeds from the buyer

h) one-half of any debt incurred as a result of any shortfall from the sale of the marital residence

i) one-half of any federal and state income tax liability as a result of any debt forgiven by the mortgage holders pertaining to the sale of the marital residence.

The Court reserves jurisdiction over the foregoing.

**23. ATTORNEY FEES**

The Court finds that neither party has engaged in any behavior that would warrant the award of attorney fees from one to the other. The Court also finds that after the divorce, both parties will have sufficient income and assets to be responsible for their own   attorney fees.

{¶ 7}    Richard asserts three assignments of error herein.   His first assigned error is   as follows:

IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL COURT TO ESTABLISH SPOUSAL SUPPORT BASED UPON RICHARD EARNING ANNUAL INCOME IN THE AMOUNT OF $500,000.00 WHEN A PORTION OF SAID INCOME WAS ACCOUNTED FOR IN VALUING RICHARD'S BUSINESS, THEREBY RESULTING IN AN INAPPROPRIATE AND UNREASONABLE SPOUSAL SUPPORT AWARD.

A.   Improper "Double-Dipping"

B.   Inappropriate and Unreasonable Spousal Support Award

{¶ 8}    Richard asserts as follows:

In awarding spousal support to Michelle in the amount of $9,000 per month, the trial court determined that Richard had annual income of $500,000. * * * In reaching this decision, the trial court disregarded the testimony of Hochwalt concerning the issue of "double dipping" and awarded Michelle spousal support based upon a portion of income that Hochwalt testified he specifically considered in arriving at the value he placed on Richard's dental practice, thereby resulting in

Michelle benefitting from the same stream of income *twice*.

{¶ 9}   Michelle responds that Richard's "theory of 'double dipping' is a fiction."

{¶ 10}   The statute governing the division of marital property in a divorce action is R.C. 3105.171, which provides in relevant part as follows:

(C)(1) Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section.

(2) Each spouse shall be considered to have contributed equally to the production and acquisition of marital property.

(3) The court shall provide for an equitable division of marital property under this section prior to making any award of spousal support to either spouse under section 3105.18 of the Revised Code and without regard to any spousal support so awarded.

* * *

(F) In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 11} "'A reviewing court is limited to determining whether a trial court abused its discretion in making a property division. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597.' *Harshbarger v. Harshbarger*, 158 Ohio App.3d 121, 2004-Ohio-3919, 814 N.E.2d 105, ¶ 14 (2d Dist.)." *Walters v. Walters*, 2d Dist. Montgomery No. 25011,

2013-Ohio-625, ¶ 22. "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990); *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

{¶ 12} R.C. 3105.18 governs spousal support and provides in relevant part as follows:

(A) As used in this section, "spousal support " means any payment to be made to a spouse or former spouse, or to a third party for the benefit of a spouse or a former spouse, that is both for sustenance and for support of the spouse or former spouse. "Spousal support" does not include any payment made to a spouse or former spouse, or to a third party for the benefit of a spouse or former spouse, that is made as part of a division or distribution of property or a distributive award under section 3105.171 of the Revised Code.

(B) In divorce and legal separation proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party. During the pendency of any divorce, or legal separation proceeding, the court may award reasonable temporary spousal support to either party.

An award of spousal support may be allowed in real or personal property, or both, or by decreeing a sum of money, payable either in gross or by

installments, from future income or otherwise, as the court considers equitable.

* * *

(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 13} "Domestic relations courts are vested with discretion concerning awards of spousal support, and their orders will not be disturbed on appeal absent an abuse of discretion. *Smith v. Smith*, 182 Ohio App.3d 375, 2009-Ohio-2326, 912 N.E.2d 1170, ¶ 77 (2d Dist.)." *Dickinson v. Dickinson*, 2d Dist. Champaign No. 2012-CA-5, 2012-Ohio-4856, ¶ 9.

{¶ 14} Richard directs our attention to *Heller v. Heller*, 10th Dist. Franklin No. 07AP-871, 2008-Ohio-3296, and *Ulliman v. Ulliman*, 2d Dist. Montgomery No. 22560, 2008-Ohio-3876. In *Heller*, one of the marital asserts was John Heller's "39.5 percent interest in a Subchapter S corporation known as H & S Forest Products, Inc. ('H & S')," that had a value of $700,018.00. *Id*. at ¶ 2, ¶ 10. John also was employed by and received a salary from H & S. *Id.* at ¶ 2. The trial court "awarded all of defendant's share in H & S to [John], and achieved an

equal division of marital property by awarding [Susan Heller] other marital assets totaling $350,000.00 in value." *Id*. at ¶ 10.

{¶ 15} Regarding spousal support, the trial court noted as follows:

Defendant's income consists of a normalized commission/ salary base of $300,000.00, a leased BMW at $1,000.00 monthly, and dividend income. Defendant receives additional gross income in the form of bonus/shareholder distribution of income that has been traditionally included in his W-2 statements. * * * The five year average of his income is $614,506.00.

* * *

The court finds that defendant's earning capacity solely from employment is $300,000.00 annually, the "normalized" income assigned by both accountants. Defendant receives significant additional income over and above this earning capacity due to his ownership interest in the company, as reflected in his W-2 income.

*Id*. at ¶ 11.

{¶ 16} The trial court then determined John's spousal support obligation to be $8,000.00 per month. *Id.* The trial court further ordered that in "addition to this monthly spousal support, [John] shall pay to [Susan] as additional spousal support twenty [percent] (20%) of each payment of additional gross (pretax) income paid to defendant by H & S * * * that has been characterized in this trial as 'bonus' income * * *." *Id*.

{¶ 17} On appeal, John asserted as follows:

[T]he trial court impermissibly "double dipped" by distributing his interest in H & S's future profits twice - first when it divided the marital property by awarding [Susan] assets valued at an amount equal to one-half the present value of defendant's share in the company (after present earnings had been determined by capitalizing future earnings), and again when it ordered payment to plaintiff of a percentage of defendant's future shareholder distribution, upon his receipt of same, as part of its award of spousal support. In other words, [John] argues that the court abused its discretion in reducing the future profits of a marital asset to present value and dividing that value equally between the parties, and then re-awarding part of [John's] half of that asset to [Susan] by ordering payment of a percentage of those profits once they are actually realized.

*Id*. at ¶ 6.

**{¶ 18}** In determining that the trial court abused its discretion "in drawing twice from the same well - [John's] share of H & S's future profits - in dividing marital assets and in ordering spousal support," the Tenth District noted as follows:

"It is a basic valuation theory that the value of a business is equal to the present worth of the *future* benefits of ownership." (Emphasis sic). Rivers, *The "double-dipping" concept in business valuation for divorce purposes.* (2006), Massachusetts Bar Assoc.[fn]. The "income method" or "capitalization of earnings method" is the most widely used method to compute the value of a business [fn]. "[T]his method relies on the discounted cash flow (DCF) model. Earnings projections, extrapolated from the company's accounting statements, are

discounted using a capitalization rate (or multiplier) that takes into account the buyer's required risk-based return and a factor for future growth." *Id*. "The concept of the time value of money is at the core of the income valuation approach. Namely, the income streams or cash flows the buyer of the business anticipates he or she will receive in the future can be translated into their present worth. * * * ." [fn]

*Id*. at ¶ 16.

**{¶ 19}** The Tenth District continued as follows:

"The 'double dip' refers to the double counting of a marital asset, once in the property division and again in the [spousal] support award. More specifically, where a court uses a business owner's 'excess earning' to value the interest in the business and also fixes support on that spouse's total income (inclusive of the the 'excess earnings' used to value the business), a 'double dip' occurs." Vuotto, *Double Trouble* (2004), found at http:// www.vuotto.com/new-jersey-divorce-articles.double-trouble.htm. (Last visited June 25, 2008). "[U]tilizing the same stream of income that forms the basis of valuing a business when calculating [spousal] support provides the non-owning spouse with the benefit from the same stream of income twice." *Id*.

*Id*. at ¶ 20.

**{¶ 20}** After reviewing R.C. 3105.171(C)(3)'s requirement that a trial court divide marital property prior to awarding spousal support, and R.C. 3105.18(A)'s provision that "'[s]pousal support' does not include any payment made to a spouse * * * that is made as part of

a division or distribution of property," pursuant to R.C. 3105.171, the Tenth District "discern[ed] a statutory mandate to keep marital property division and spousal support separate, and to consider the potential 'double dip' when ruling upon these issues in cases where one spouse's ownership interest in a going concern is discounted to present value and divided, and where excess earning arising from that ownership interest will constitute part of that spouse's stream of income into the future." *Id*. at ¶ 21.

{¶ 21} The Tenth District concluded as follows:

[Susan] receives her share of the total value of the business immediately by a tax-free offsetting assignment of other, presently liquid assets, while [John] cannot immediately reap the benefit of H & S's future excess earnings, and will be required to pay 20 percent of his share of the value once he receives it, even though [Susan] will have already received her share of this value. In ordering this result, the court "double dipped," or awarded part of the same asset to [Susan] twice. This resulted in an unequal property division, not in accordance with R.C. 3105.171. Trial courts may treat a spouse's future business profits as a marital asset subject to division, or as a stream of income for spousal support purposes, but not both. When the trial court in this case treated defendant's share of H & S's expected future profits as both an asset and as income for spousal support purposes, this constituted an abuse of discretion.

*Id*. at ¶ 23.

{¶ 22} In *Ulliman*, Matthew Ulliman owned a one-half interest in the Ulliman Schulte Construction Company, valued, based upon the "'capitalized earning' method of valuation," at

$4,780,500.00, and Matthew also received "a salary for his services as an employee, which has been an average of $225,000 per year." *Ulliman*, 2d Dist. Montgomery No. 22560, 2008-Ohio-3876, at ¶ 2, ¶ 4. Ulliman Schulte was "an 'S corporation' for federal tax purposes. This means that instead of being taxed at the corporate level, each year the company's earned income is said to 'flow through' to Matthew and his partner, who each claims half of the income on his personal tax return. The company disburses to each of them sufficient funds to pay the tax liability not only on the corporate income but also on their personal income." *Id.* at ¶ 3.

{¶ 23} The trial court awarded Matthew the full marital interest in Ulliman Schulte, and ordered him to pay Susan her half of its estimated value. *Id*. at ¶ 4. The trial court further based Matthew's spousal support obligation on his average annual income of $225,000.00, determining that $5,000.00 per month was reasonable and appropriate. *Id.* at ¶ 7. This Court noted as follows on Susan's appeal:

Susan asked the trial court to consider half of Ulliman Schulte's retained earnings, in addition to his salary, as Matthew's income for support purposes. The court refused. To consider retained earnings as his income, said the trial court, would constitute unfair "double dipping." Adopting the concurring opinions of the experts, the court explained that the value assigned to the marital interest was based on the company's historic earned income, the unspent sum of which makes up retained earnings. Susan was awarded her marital property share of the company's estimated value, which included part of these earnings. To consider retained earnings again, as Matthew's income for support purposes, would be allowing Susan to dip into the

same income stream – the company's earned income – twice.

Considering only his employment income, the court found his average annual income to be $225,000, and it based its support obligation on this amount.

* * *

*Id*. at ¶ 6-7.

{¶ 24} Susan argued in part that the trial court abused its discretion in calculating Matthew's spousal support obligation based upon his "W2 forms," which she asserted "grossly underestimated his actual income," and that Ulliman Schutte's retained earnings should have been considered part of Matthew's income for spousal support purposes. *Id.* at ¶ 12-13. Neither party briefed the "double dipping" issue on Susan's appeal. *Id*. at ¶ 13, fn. 2. In affirming the decision of the trial court, this Court noted in part that although, as an "S corporation" Ulliman Schulte's "income is said to 'flow through' to Matthew, it does so metaphorically; no actual cash 'flows through' to Matthew. Susan's assertion notwithstanding, this income is merely a number on his tax return, not cash in his pocket." *Id.* at ¶ 16.

{¶ 25} On the specific facts before us, we reject Richard's argument that the trial court abused its discretion by engaging in impermissible "double dipping." The double-counting analytical framework works well for fixed assets that produce an income stream, such as a pension or annuity. But it is not as easily applied for suggesting that income from a closely-held business, particularly a wholly-owned professional practice, is counted twice when that income is considered as a tool to value the business and then as actual income for a spousal-support calculation.

{¶ 26} This case clearly illustrates the analytical difficulty. Here, Richard is the sole

proprietor of a professional dental practice. Using rough numbers for illustration, the practice generates $500,000 in annual income. He voluntarily elects to receive periodic compensation of only about $200,000 a year. The remaining $300,000 is imputed to him at year end as a result of the business's income. Nothing prevents him from electing to receive the entire $500,000 as salary paid throughout the year.

{¶ 27}   The practice was evaluated by three experts. The trial court determined that Milton Zimmerman placed the fair market value at $240,000 using a market-based approach. Actually, his testimony (T. 284) and his report (Defendant's Exh. K) reflect that he used an average of a market-based approach and an earnings approach.[2] The second expert, J.R. Hochwalt, testified that the fair market value was $689,600 as of December 31, 2009 but that if the practice had declined fourteen percent since then his value would be $500,000. He used the income method, perhaps more correctly identified as the capitalized-earnings method, utilizing the business income of roughly $300,000 minus roughly $100,000 attributable to taxes, for a generated income of about $200,000 per year. That translates to an invested-capital value of about 1.4 million dollars, minus business debt of about $432,000 for a marketable interest of about $985,000, reduced by a "lack of marketability" discount of thirty percent, producing the end marketable value of $689,600. The third expert, Alan Duvall, used a capitalized-earnings method and incorporated a cash-flow method to arrive at a fair market value of $1,137,000. Duvall attributed the difference between his assessment and Hochwalt's to his opinion that a marketability discount should not be applied to the gross-value figure. The trial court determined

---

[2]Zimmerman's original report (Exh. K)  had listed a value of $258,025 but that was later modified to $240,426, as reflected in Exhibit QQ, by removal of the sale of a dental practice that Zimmerman determined was a distorted data point (T. 279).

that a marketability discount was appropriate and concluded that $689,600 was the fair market value of the business.

{¶ 28}   Although income retained by the business was utilized to arrive at a fair market value, that does not mean the business income was "counted" against Richard. It was just the method used to arrive at the business's fair market value. Surely, if the business value were arrived at by using one of the other two methods of valuation—the market approach (as Zimmerman did for his $240,000.00 value) or the asset approach—no one reasonably would assert that Richard's income was counted twice.

{¶ 29}   Here the complaint was filed on December 3, 2009, which is the date the court used for termination of the marriage, and the court set the value of the business as of December 31, 2009. At that time, Richard was forty-four years old. If one assumes he would work at his practice until age sixty-four, that would be twenty years of $300,000 a year additional income or six million dollars. The present value of such a non-increasing[3] income stream, using a modest five-percent discount rate, would be $3,904,088.52. The value placed on the business in this case is nowhere near the present value of that kind of a defined income stream. Even if one assumes that Richard retires very early at, say, age fifty-four, ten years of additional income of $300,000.00 a year is three million dollars with a corresponding present value of $2,425,414.92. One might reasonably argue that the $300,000 per year is pre-tax income. So, reduce the amount by one-third.[4] With that adjustment, the income stream assuming age sixty-four retirement

---

[3]One could reasonably project that the income from the business will increase over time. That also would increase the present value of the income stream. For illustration purposes, a flat future stream is assumed.

[4]Hochwalt used a thirty-five percent adjustment for the income taxes imputed to the defendant. (Exhibit 24, Appendix A). Using approximations for illustration, a 33 1/3 percent or one-third attribution provides for easier division and extrapolation.

provides four million dollars, with a present value of $2,602,725.68, and early retirement at fifty-four provides two million dollars with a present value of $1,616,943.28. Therefore, even construing income and retirement most favorably to the practitioner, the present value of the future stream of income is almost *one million dollars* more than the determined value of the business. Those computations alone demonstrate that valuing the business using an income methodology does not "double count" income to Richard's detriment.

{¶ 30} The potential for disproportion achieved by imposing a double-counting restriction is also apparent when viewed another way. In this case, the dental practice was valued at $689,600. Michelle gets half, or roughly $350,000. In less than two years post-divorce, with the additional $200,000 after-tax retained income, Richard has recouped the entire distribution to Michelle. He then realizes the benefit of that $200,000 additional income every year for the rest of his professional career, however long that may be, free and clear from any support claim. Meanwhile, Michelle's $350,000, even at a favorable five-percent growth rate, generates about $17,500. With that in mind, the trial court's disposition of the issue in this case was not an abuse of discretion.

{¶ 31} A concise explanation of error that can result from application of double-dipping for closely-held businesses appears in Morgan, *"Double Dipping": A Good Theory Gone Bad*, 25 J. Am. Acad. Matrim. Law. 133 (2012). The author persuasively argues that the double-dipping "principle must be confined to pension-type assets where the asset *is* the income, not businesses where the asset's value and the income it produces are separate entities." *Id.* at 135. "Equitable distribution is a property right based on the fair market value of assets, whereas spousal support is a needs based concept based [on] income. Income is used in the

former concept only as a tool to determine fair market value. Therefore, it is not double dipping to consider income in property division and to consider income in spousal support." *Id.*

{¶ 32} We recognize that in *Ulliman* this court held it was not an abuse of discretion for the trial court to exclude retained earnings of the husband's company, of which he was a one-half owner, in calculations for spousal and child support. The business had been valued, using an income method, and the asset was divided. Then the trial court excluded those earnings for support computations because, the trial court said, counting the retained earnings again for support would be "double dipping." Notably, we did not base our determination on a "double dipping" argument because that specific issue was not raised on appeal. *Ulliman* at ¶ 13, fn. 2. Nevertheless, in *Ulliman*, the husband was only a one-half owner of the business and "[t]he evidence [was] weak that [his] control over the retained earnings of Ulliman Schutte [was] sufficient to allow him unilateral access for personal reasons." *Id.* at ¶15. We also commented that we should defer to sound business reasons to retain earnings in the Ulliman-Schutte construction company. In contrast, Richard is the sole owner of his dental practice, and there is evidence that his family's lifestyle resulted from unfettered access to the business's income. Therefore, we find *Ulliman* distinguishable.

{¶ 33} We also recognize the Tenth District's holding in *Heller* that it was an abuse of discretion for the trial court there to count the husband's share of future profits from the company he worked for, and from which he was separately paid, when the business profits also had been used to evaluate, and divide, the business interest as a marital asset. That case is more similar to the one before us, but it too is distinguishable. The husband had a 39.5 interest in the company, which generated bonus income in addition to salary. His interest in the company was evaluated

using capitalized future earnings. Then the trial court ordered payment of a percentage of those earnings, upon receipt, to the wife as part of spousal support. The *Heller* court reversed and held that the trial court "awarded part of the same asset to plaintiff twice." *Id.* at ¶ 23. In *Heller*, however, the husband's interest was a minority interest without indication that he had exclusive control. Moreover, the company had "no fixed assets" and "the company's value [was] made up entirely of 'blue sky intangible assets.'" *Id.* at ¶ 17. In contrast, Richard's dental practice here had about $120,000 in equipment, computers, and inventory (Exh. K pgs. 9.1 and 9.3), and more than $50,000 in receivables, although we recognize it also had more than $400,000 in debt. (*Id.*). In any event, to the extent that the present case may resemble *Heller*, we decline to follow it because of the difficulty in the double-dipping analysis when dealing with solely owned, closely-held business evaluation as opposed to defined-income-stream distribution. On this record, which involves a closely-held business where Richard had complete control over the business's retained earnings to support the parties' lavish lifestyle, we conclude that the trial court did not engage in impermissible "double dipping" by using income as a tool to value the business and then as actual income for a spousal-support calculation. Accordingly, Richard's first assignment of error is overruled.

{¶ 34} Richard's second assigned error is as follows:

IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL COURT TO RETAIN JURISDICTION OVER THE DURATION OF RICHARD'S SPOUSAL SUPPORT OBLIGATION.

{¶ 35} According to Richard, "despite the trial court's stated duration of seven (7) years, the trial court essentially created an indefinite spousal support award when it retained jurisdiction over both the amount and duration of Richard's spousal support obligation and * * * this result is in direct contravention of the Ohio Supreme Court's directives outlined" in *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 554 N.E.2d 83 (1990). Richard asserts as follows:

* * * Richard's concern is directed specifically to the trial court's reservation of jurisdiction as to the duration of the spousal support obligation, which effectively transforms what would otherwise have been a spousal support obligation terminable upon a date certain into a potentially definite order. Richard asserts that it is the trial court's reservation of jurisdiction over the duration of the spousal support obligation that is contrary to [*Kunkle*], which requires a balance between the recipient spouse's need for interim support necessary to become self-supporting and the need for certainty in judgment and a definitive limit upon the parties' rights and responsibilities. By awarding Michelle spousal support for a period of seven (7) years but then reserving jurisdiction over the duration of the obligation, the trial court has tipped the balancing test in favor of Michelle and has provided no certainty in judgment and no definitive limit upon the parties' rights and responsibilities.

{¶ 36} In *Kunkle*, the Supreme Court of Ohio determined as follows:

Except in cases involving a marriage of long duration, parties of advanced age or a homemaker-spouse with little opportunity to develop meaningful employment outside the home, where a payee spouse has the resources, ability and

potential to be self-supporting, an award of sustenance alimony should provide for the termination of the award, within a reasonable time and upon a date certain, in order to place a definitive limit upon the parties' rights and responsibilities.

*Id.* at paragraph one of the syllabus.

{¶ 37}    The record reflects that the parties were married for 20 years, and at the time of trial, both parties were 46 years old.  Michelle testified that she obtained a bachelor's of arts degree in speech communication from Miami University.  She stated that "at the time I was going to go to law school * * *."  She stated that she and Richard were married two years after she graduated from Miami.  She stated that she last was employed in 1994.  She stated that in 1993 she earned $50,000.00 after taking a "buy-out" from Dun & Bradstreet, where she "sold business reports to manufacturing and other companies in the Dayton area."   When asked if she believed that she has the skills to return to the type of work she did for Dun & Bradstreet, Michelle replied, "I know that I don't."   Michelle stated that she assisted Richard in his practice from 2006-2009, namely helping him with collections and developing "some marketing for him."  She further stated that the skills that she utilized in working with Richard would not enable her to obtain employment.  Michelle testified that she is "going to have to need to do some work to get back on my feet."  Michelle stated that her youngest child is 11 years old.  She stated that she considered getting an MBA, and that she also "considered going back to law school."  Michelle testified, "an MBA for full time is two years and law school, three.  But I have [K.B.] at home.  So it will take me longer. * * * Maybe twice as long.  Four years."

{¶ 38} Recently, in *Edwards v. Edwards,* 2d Dist. Montgomery No. 25309, 2013-Ohio-117, this Court affirmed an award of spousal support in the amount of $1,000.00 per

month for three years for Jennifer Edwards and determined that the trial court did not abuse its discretion in retaining jurisdiction over the amount and duration of the award. *Id*. at ¶ 58. Jennifer and Geoffrey Edwards were married for 11 years. *Id*. at ¶ 3. In reliance in part upon *Canfarelli v. Canfarelli,* 2d Dist. Montgomery No. 18145, 2000 WL 966165 (July 14, 2000), in which this Court reversed the trial court based upon its failure to set a specific termination date for spousal support, this Court in *Edwards* determined as follows:

> Consistent with *Kunkle*, the trial court set such a definite period of three years for Jennifer's spousal support award. The trial court's retention of jurisdiction over the duration and amount of the award is also fully consistent with the comments that we made in *Canfarelli*.

> We noted in *Canfarelli* that an additional basis for reversal in *Kunkle* was the trial court's failure to reserve continuing jurisdiction over the award. *Canfarelli*, 2000 WL 966165, at * 4. In this regard, we stated that:

>> [I]f the trial court in this case had failed to reserve jurisdiction to modify the indefinite support award, that would clearly have been an abuse of discretion. See, *e.g., Gullia v. Gullia* (1994), 93 Ohio App.3d 653, 661, 639 N.E.2d 822 (holding that failure to reserve jurisdiction to modify an indefinite award of support is an abuse of discretion.) Our own district has even said that if spousal support is ordered for a substantial period of time and the economic condition of the parties is likely to change, a trial court abuses its discretion by not providing that the order is subject

to later modification. See*, e.g., Canales v. Canales* (March 17, 1989), Greene App. No. 88 CA 52, unreported, p. 8 (trial court should have reserved jurisdiction to modify where four-year sustenance alimony was awarded), and *Jackson v. Jackson* (Nov. 8, 1996), Montgomery App. No. 15795, unreported, p. 3 (approving and following *Canales*, and holding that trial court should have reserved jurisdiction to modify, where support was awarded for three year period). As a result, we find nothing significant about the trial court's reservation of jurisdiction in the present case. *Id.* at *5.

In light of the above comments, the trial court did not abuse its discretion in retaining jurisdiction over Jennifer's spousal support award. As Jennifer points out, the retention of jurisdiction makes it possible for both parties to ask for modification of the award, should their economic circumstances change. In this regard, we note that Jennifer was scheduled to graduate shortly after the final decree of divorce, and if she is self-supporting, this retention of jurisdiction might work in favor of Geoffrey.

*Edwards* at ¶ 56-58.

**{¶ 39}** As in *Edwards*, we conclude that the trial court set a definite termination date for Michelle's spousal support, namely seven years. Richard and Michelle's marriage was of long duration, Michelle lacks a significant employment history to enable her to immediately find appropriate employment, and she testified that she believed she could complete additional

education in four years. We further cannot conclude that the trial court abused its discretion in retaining jurisdiction over the duration of Michelle's spousal support award, since the retention of jurisdiction makes it possible for both Michelle and Richard to ask for modification of the award. Richard's second assigned error is overruled.

{¶ 40} Richard's third assigned error is as follows:

THE TRIAL COURT ERRED WHEN IT FAILED TO RULE UPON RICHARD'S REQUEST TO RECEIVE CREDIT ON THE DURATION OF HIS PERMANENT SPOUSAL SUPPORT OBLIGATION BASED UPON THE LENGTH OF TIME HE PAID TEMPORARY SPOUSAL SUPPORT.

{¶ 41} At trial and in his post-hearing brief, Richard requested a two-year credit on the duration of his permanent spousal support obligation, and he asserts that the "trial court erred in failing to rule on his request and therefore respectfully requests that this matter be remanded for further proceedings so that the trial court can exercise its discretion and make a determination on this issue."

{¶ 42} As this Court has noted, "[w]hen a trial court has not ruled on a motion prior to the conclusion of the case, the motion is deemed overruled. *Thornton v. Conrad*, 194 Ohio App.3d 34, 2011-Ohio-3590, 954 N.E.2d 666 (8th Dist.)." *Fin. Freedom Aquisition*, *L.L.C. v. Heirs of Thomas*, 2d Dist. Montgomery No. 25047, 2012-Ohio-3845, ¶ 10; *JP Morgan Chase Bank v. Wiram*, 2d Dist. Clark No. 2013 CA 3, 2013-Ohio-2232, ¶ 13.

{¶ 43} Having reviewed the record, we cannot conclude that the trial court abused its discretion in ordering Richard to pay spousal support for a period of seven years, as opposed to a period of five years based upon a credit for the temporary support he paid to Michelle. The trial

court imputed income to Michelle in the amount of $17,000.00 per year, while Richard's income exceeds $200,000.00. Richard has greater relative earning power and education than Michelle. The parties were married for 20 years, Michelle has custody of the parties' minor child who was 11 at the time of the divorce, and she will incur expenses over time as she seeks the education, training or job experiences necessary to enable her to obtain appropriate employment. There is no suggestion that Richard's age, or physical, mental or emotional health will impede his ability to pay spousal support for seven years. For the foregoing reasons, we conclude that the seven-year duration of the spousal support order is appropriate and reasonable. Accordingly, Richard's third assigned error is overruled.

{¶ 44} Michelle asserts three assignments of error in her cross-appeal. Her first assigned error is as follows:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN ALLOCATING THE TAX DEPENDENCY EXEMPTIONS.

{¶ 45} According to Michelle:

Section 151 of the Internal Revenue code provides for the phasing out of the tax exemption for children of the taxpayer once the taxpayer's adjusted annual income exceeds $125,000.00. The code completely eliminated the tax exemption once the taxpayer's adjusted annual gross income reaches $250,000.00. As [Richard's] annual income exceeds $500,000.00, [Richard] will enjoy no benefit from the tax exemption.

{¶ 46} Richard asserts that although "the trial court did not state a basis for this award, the record of proceedings held over the course of three (3) days is replete with the financial data

necessary for the trial court to have reached this determination." Richard asserts that the "phaseout and elimination information" in Michelle's brief is incorrect, and that "his adjusted gross income is nowhere near the elimination figure for the 2013 tax year and that he in fact will benefit from the allocation of the tax exemption for the parties' minor child in all even-numbered years as [the trial] court has ordered."

**{¶ 47}** As this Court has noted:

> "The decision to allocate tax exemptions is a matter left to the discretion of the trial court. * * *. R.C. 3119.82 requires the trial court to consider any 'relevant factor concerning the best interest of the children' in making such a decision." *Flynn v. Sender*, Cuyahoga App. No. 84406, 2004-Ohio-6283, ¶ 33, quoting *Singer v. Dickinson* (1992), 63 Ohio St.3d 408, 588 N.E.2d 806.

*In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 55 (2d Dist.).

**{¶ 48}** R.C. 3119.82 governs the designation of the parent who may claim children as dependents for federal income tax purposes. R.C. 3119.82 provides:

> Whenever a court issues * * * a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes as set forth in section 151 of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 1, as amended. If the parties agree on which parent should claim the children as dependents, the court shall designate that parent as the parent who may claim the children. If the parties do not agree, the court, in its order, may permit the parent who is not the residential parent and legal custodian to claim the children as

dependents for federal income tax purposes only if the court determines that this furthers the best interest of the children * * *. In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children.

**{¶ 49}** This Court has previously noted as follows:

> The foregoing statute recognizes a presumption that the custodial parent will receive the tax exemption for dependent children. It provides that a noncustodial parent may be awarded the exemption only upon a finding by the trial court that such an allocation furthers the best interest of the children. Therefore, the default position, absent this finding by the trial court, is that the custodial parent receives the tax exemption. See, e.g., *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 56. The presumption that the custodial parent should receive the tax exemption comports with federal law. *Hughes v. Hughes* (1988), 35 Ohio St.3d 165, 167, 518 N.E.2d 1213.

*Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 50 (2d Dist.).

**{¶ 50}** Here, the trial court did not expressly determine that permitting Richard to share the tax exemption would be in the best interest of K.B. In neither its Decision following trial

nor in the Final Decree did the court provide an explanation for the allocation. The trial court did not refer to R.C. 3119.82, any factors set forth therein, or any other relevant factors concerning K.B.'s best interest, a fact acknowledged by Richard in his brief. As this Court did in *Long*, we conclude that "the proper approach is to remand the cause to permit the trial court to explain the basis for its decision." *Id.* at ¶ 53. For the foregoing reasons, Michelle's first assigned error is sustained. The trial court's allocation of the tax exemption will be reversed due to lack of an explanation for it. On remand, the trial court remains free to require the parties to share the tax exemption if it provides a sufficient basis for its decision. Either party may then appeal the trial court's new determination on this issue by filing a new notice of appeal.

{¶ 51} Michelle's second assigned error is as follows:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT OFFSET WIFE'S PORTION OF THE PROPERTY SETTLEMENT AGAINST EXPENSES ALLEGEDLY INCURRED BY HUSBAND.

{¶ 52} According to Michelle, the "Trial Court found that Wife should be responsible for $38,534.00 of costs associated with the marital residence. This decision is simply inequitable considering the incomes of the parties, the earning abilities of the parties, and the minimal temporary spousal support order Husband paid to Wife during the proceedings in this case."

{¶ 53} As this Court previously noted, "'an equitable division of marital property necessarily implicates an equitable division of marital debt.'" *Buzard v . Buzard*, 2d Dist. Clark No. 2011 CA 18, 2012-Ohio-2658, ¶ 32, quoting *Elliott v. Elliott*, 4th Dist. Ross No. 05CA2823, 2005-Ohio-5405, ¶ 16.

{¶ 54}    Michelle stated that she vacated the marital residence and moved to Cincinnati when she had "a total ankle donor graft replacement surgery."    Michelle testified that the marital residence was approximately 8,000 square feet.    She testified that the "furnace had broken. And I tried to get it fixed, but I didn't have enough money to cover the things that were wrong. We had a rodent infestation in our lower level.    We used to have an exterminator, but my husband cancelled it. * * *."

{¶ 55}    Richard testified that he moved out of the marital residence on February 28, 2010, and that he lived with a friend until April, 2011.    Richard stated that he learned that Michelle moved out of the marital residence on August 24, 2011.    Richard testified that when he regained entry to the marital residence, "the home was an absolutely wreck." (Sic).    He stated that "almost every drawer in the kitchen was full.    The majority of the pantry was full. * * * There were items in the playroom upstairs.    There were items all over."    Richard stated the home "was not as clean as I would expect somebody leaving a home, and for it still to be on the market.    There were urine stains from the dog on the carpet. * * * dust in a lot of places.    It was in pretty bad shape.    One of the dryers, the drum was totally missing."    He stated that a built-in icemaker had been removed.    When asked how long it took him to return the home to a salable condition, Richard replied, " * * * it probably took a good part of two months."

{¶ 56}    Richard identified exhibits TT and UU that he testified demonstrate "the amount of money that it's taken to maintain the home while it's been vacant."    For example, Richard testified that   " * * * we had a contract in January of 2012, the potential buyer did an inspection of the home.    And the inspection revealed extensive damage around the windows, leakage of water behind windows through the miter joints in the windows damaging the substrate below, the

EIFS or Dryvit material on the outside of the house." Richard stated, "the major repair was the exterior repair. We had to replace three windows entirely, remove windows that were not properly flashed. It took about two months to get those repairs done." Richard testified that "having known about it, I couldn't keep the house on the market and sell it to somebody else because now I know about deficiencies in the home and they have to be fixed."

{¶ 57} We cannot conclude that the trial court abused its discretion in offsetting Michelle's award of marital property by half of the expenses Richard incurred in selling the marital residence. We agree with the trial court that the expenses associated with the large house constitute marital debt. As the trial court noted, Michelle chose to vacate the marital residence and purchase a new home, and we note that the trial court, pursuant to an Agreed Order of February 9, 2012, found her in contempt of court for doing so. We note that Michelle does not dispute the amount of the expenses documented in Exhibits TT and UU, and her own testimony establishes that the home was in need of significant repairs after her exclusive residence there. Since an abuse of discretion is not demonstrated, Michelle's second assigned error is overruled.

{¶ 58} Michelle's third assignment of error is as follows:

THE TRIAL COURT ERRED AN[D] ABUSED ITS DISCRETION WHEN IT FAILED TO ORDER HUSBAND BE RESPONSIBLE FOR WIFE'S ATTORNEY FEES.

{¶ 59} R.C. 3105.73 provides as follows:

(A) In an action for divorce, * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds

the award equitable. In determining whether an award of fees is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 60} "The decision to award attorney's fees rests in the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. *Layne v. Layne* (1992), 83 Ohio App.3d 559, 568, 615 N.E.2d 332." *Gore v. Gore*, 2d Dist. Greene No. 09-CA-64, 2010-Ohio-3906, ¶ 34. In *Gore*, this Court noted that "'[i]mportant considerations when a trial court computes an award of attorney's fees include the time and labor involved and the fee customarily charged in the locality.' * * * We have also said, however, that these are only two of many factors that a trial court should consider. * * * The quality of work done is also a proper consideration. * * * ." *Id*. at ¶ 35.

{¶ 61} At the start of the hearing, the trial court indicated as follows regarding the issues of attorney fees:

> * * *
>
> It was my understanding, in part at least, that if I felt an award of fees was appropriate, I would set a separate hearing to have a hearing on attorney's fees. If instead I felt that each party was responsible for their own attorney's fees, I would journalize that in my decision, and we would go from there.

{¶ 62} Michelle testified that she was unable to pay her attorney fees, and she sought an award of all of her attorney's fees from Richard. Richard testified that he sought an award of

fees from Michelle for 44 hours of work at $225.00 an hour, and he asserts in his brief that the fees were "incurred in direct relation to Michelle's actions that Richard claimed w[]ere contemptuous and/or to enforce compliance with an obligation." As Richard further asserts in his brief, "neither party offered an independent witness or expert to testify concerning the necessity of the time and labor involved, the fee customarily charged in the locality and/or the reasonableness of the fees incurred."

{¶ 63} We note that in *Gore*, this Court overruled John Gore's assignment of error that the trial court abused its discretion in requiring him to pay $19,638.00 for the attorney fees of his wife, Peggy. *Id.* at ¶ 31. In *Gore*, an "attorney who practices domestic relations law in Greene County and is familiar with the fees customarily charged testified. He said that the case was complex, requiring extensive discovery and trial preparation. He also said that the hours billed by [counsel for Peggy] for his time and that of his paralegal were reasonable and necessary." *Id.* at ¶ 38. Unlike in *Gore*, Michelle presented no billing statements from the multiple attorneys who represented her herein and no evidence that her attorney fees were reasonable and necessary. Accordingly, we see nothing arbitrary or unreasonable in the court's decision to require Michelle to pay her attorney fees. Since an abuse of discretion is not demonstrated, Michelle's third assigned error is overruled.

{¶ 64} We hereby affirm in part and reverse in part the judgment of the trial court, and we remand this matter to permit the trial court to identify the basis, if any, for its decision regarding the tax-dependency exemption, consistent with our analysis of Michelle's first assigned error. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J., and DONOVAN, J., concur.


Copies mailed to:

David M. McNamee
Keith R. Kearney
Amy R. Blair
Hon. Timothy D. Wood