[Cite as *Settele v. Settele*, 2015-Ohio-3746.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Ann E. Settele,                                    :

       Plaintiff-Appellee/             :
       Cross-Appellant,

                             :                    No. 14AP-818

v.                                                  (C.P.C. No. 11DR-11-4612)

                             :

Siegfried J. Settele,                              (REGULAR CALENDAR)

                             :

       Defendant-Appellant/
       Cross-Appellee.                 :

---

D E C I S I O N

Rendered on September 15, 2015

---

*Barry H. Wolinetz*, for appellee/cross-appellant.

*Mowery Youell & Galeano, Ltd.*, *Judith E. Galeano*, and *Justin A. Morocco*, for appellant/cross-appellee.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

SADLER, J.

{¶ 1} Defendant-appellant/cross-appellee, Siegfried J. Settele ("appellant"), and plaintiff-appellee/cross-appellant, Ann E. Settele ("appellee"), appeal the September 17, 2014 judgment entry-decree of divorce of the Franklin County Court of Common Pleas, Division of Domestic Relations. For the following reasons, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The parties married on November 28, 1988. On November 30, 2011, appellee filed for divorce. After a magistrate issued temporary orders and the parties

exchanged several motions for contempt, the parties entered into an agreement concerning parental rights and responsibilities of their two children, with appellee designated as the sole legal custodian of the parties' one minor child and appellant accorded scheduled parenting time. The bulk of the remaining contested issues in the divorce ultimately came to a multiple day trial, beginning January 31, 2014.

{¶ 3} The trial court was tasked with valuing, as marital property, the dental business appellant owned and operated initially as a sole proprietorship and then, after a business reorganization during the pendency of the divorce, as a single-member limited liability corporation ("LLC"). Appellee's expert, Brian A. Russell, valued the business using an adjusted net asset approach. He did so after eliminating an income-based approach because it marked the value of the business as less than its assets, which he noted generally is considered the floor value of a business, and after eliminating a market-based approach because it yielded such a wide range of results that he determined that method to be unreliable.

{¶ 4} Russell explained that "the asset approach is based on certain assets, bank accounts, accounts receivable, equipment as of a point in time, and the value of those at that particular point in time." (Tr. 75.) In response to questioning about *Heller v. Heller*, 10th Dist. No. 07AP-871, 2008-Ohio-3296 ("*Heller I*"), Russell responded:

> The double-dipping issue has no bearing on an instance where the company is valued based on an asset approach. That issue is relevant when the company is based on a capitalization of earnings approach with the argument, or the potential double counting, being that you counted a net earnings stream and capitalized it to determine the business value, and then you may also be using that same earning stream for determining income level for support purposes. Therein lies the potential for a double counting.

(Tr. 76-77.)

{¶ 5} Russell then explained that he used the company balance sheets coupled with certain adjustments to reach a valuation of $313,286. Specifically, Russell testified that the 2013 company balance sheet reflected a total business checking account balance of $67,186, a negative accounts receivable balance of $2,990, and a net book value of

equipment of $38,662. After subtracting liabilities of $21,500, Russell determined the value of the dental business, before adjustments, to equal $81,358.

{¶ 6} Russell's first adjustment added $53,468 in expense payments made on December 31, 2013 to the business value, explaining "from an accounting standpoint, [those expenses] didn't absolutely have to be paid on December 31st. And even if they were paid, under generally-accepted accounting principals, you would record those as a prepaid expense, an actual asset that the company had, as of December 31st of that date." (Tr. 84.)

{¶ 7} Russell's second adjustment added $206,473 in accounts receivable to the business value. Russell testified that he used the standard method of aging accounts receivable under the asset-based approach, a method which uses an aging scale to reduce the face value of each account receivable held on December 31, 2013 by a designated percentage to capture the risks associated with collectability.

{¶ 8} Russell's final adjustment altered the book value of the furniture and equipment. He first added back part of the value of furniture purchased at the end of 2013, which was depreciated entirely, and then subtracted $16,941 in lease-holding improvements. Regarding the value of company equipment and furniture, Russell stated he did not conduct an appraisal but believed an appraisal would not produce a result greater than what the company reflected on its balance sheet.

{¶ 9} After these adjustments, according to Russell, the total assets of the dental business stood at $358,367. Russell then subtracted current liabilities of $21,500 and applied a marketability discount of seven percent to end up with the ultimate adjusted net asset value of $313,286.

{¶ 10} On cross-examination regarding the business valuation, when asked about the accounts receivable in his adjustment, Russell agreed that, "in a cash basis tax bearing under a tax basis method of accounting * * * [w]hen those receivables are collected in the subsequent period or in the following year, they would be recognized as taxable income as the collection of those receivables in that subsequent year." (Tr. 121.) Russell later elaborated that:

> [T]here is an ongoing rolling average of collecting that
> month's billings into the next month's billings * * * at any

given point in time, I would expect, based on this sales volume, that there's going to be approximately 200-some thousand dollars of accounts receivable in existence and those are going to, as a rolling average, continue being collected and recognized as cash basis income.

(Tr. 138-39.)

{¶ 11} Russell also provided the trial court with calculations of spousal support, including an analysis of the income and earnings of the parties. Russell testified that he arrived at appellant's adjusted gross income by using the average of the dental business earnings from 2011 through 2013 as a starting point and reducing that number by child and spousal support paid. For 2011 and 2012, Russell used the net profit stated on appellant's federal Schedule C tax forms, and for 2013, Russell used the net profit stated on the company profit and loss sheet. After calculating appellant's adjusted gross income and adjusting for taxes, Russell determined a monthly pre-tax spousal support amount of $6,292. Russell testified on cross-examination that he did not consult appellant or the company CPA about the 2013 earnings used in the spousal support computation.

{¶ 12} Appellee also called appellant's bookkeeper, Susan Schnitz, to testify. Schnitz, a proprietor of a "backoffice bookkeeping" company, testified that her business set up and managed appellant's business and personal checking accounts. (Tr. 299.) Schnitz elaborated that when her company receives appellant's personal bills, "we write the checks out of his personal account, and then we take a draw from his business to his personal to cover those expenses." (Tr. 308.) According to Schnitz, appellant categorized items as personal or business. She also confirmed that on July 11, 2013, Nationwide Insurance wired $10,460.41 directly into appellant's business checking account as an insurance proceeds payment arising from his daughter's car accident which "totaled" the 2007 Mercedes she regularly drove to high school. (Tr. 309.)

{¶ 13} Appellant's expert, Richard Ferguson, also testified regarding the value of the dental business, which he placed at $390,000. Unlike Russell, in reaching his valuation, Ferguson utilized an income-based capitalization of earnings method which, according to his report, relies on the historical earnings of a business to determine an appropriate future earnings base and then capitalizes that future earnings base by a rate to produce a present value.

{¶ 14} To determine the future earnings base, Ferguson averaged earnings from 2011, 2012, and 2013 using the amounts stated in the Schedule C tax forms for 2011 and 2012 and the company financial statement for 2013. He then adjusted that yearly average to account for officer's compensation, the hypothetical amount a buyer would need to replace himself with an operator/manager, to arrive at a "going forward income" for the business of $74,000. (Tr. 468.) Lastly, Ferguson divided $74,000 by a capitalization rate of 19 percent, derived from returns in the market and the specific dental business, to reach the ultimate business value of $390,000.

{¶ 15} Regarding valuations using asset-based methods, Ferguson testified that an appraisal of the fixed assets must be used to ascertain fair-market value. He later noted that, although generally appraisers should visit the place of business, opposing parties in domestic cases sometimes do not cooperate in allowing a visit to occur. When questioned specifically about Russell's report and updated adjustments, Ferguson had "[n]o problem" with Russell's methodology or the calculations. (Tr. 472.) Ferguson also testified that, although he thought the dental business had a history of pre-paying expenses each year, no record evidence showed the company annually pre-paid expenses prior to December 2013.

{¶ 16} On September 17, 2014, the trial court issued its judgment entry-decree of divorce. Relevant to this appeal, the trial court found the dental business to be marital property with a value of $313,286, the "most conservative and directly relevant – and therefore the most equitable" figure provided. (Sept. 17, 2014 Decree of Divorce, 12.) In its allocation of marital property, the court assigned a partial value of the dental business to each party and assigned $10,461 for the 2007 Mercedes insurance proceeds to appellee. Once the trial court allocated all of the remaining martial assets and liabilities, each party received a total net distribution of $430,319.

{¶ 17} In addition, the trial court ordered appellant to pay spousal support in the amount $6,292 per month for an indefinite period, while retaining jurisdiction to modify the amount and duration of the award. In doing so, the court determined that appellant's earning ability is $254,973 based on the three-year average from 2011 to 2013 supplied by Russell. The trial court also noted that, although appellee was compensated for her share

of the dental business in the division of marital property, appellant possesses potential to continue generating substantial earnings from the business for many years.

{¶ 18} Lastly, the trial court found it fair and equitable that each party pay its own attorney fees. Although the trial court found appellee more credible on the issue of appellant's conduct, for example in his "vigorous[] attempt[s] to secure for himself a number of marital assets and * * * attempt[s] to shape his testimony to achieve those ends," it noted that appellant conceded custody of his minor daughter to appellee and did not argue against child support or an order of spousal support beyond contesting the amount. (Sept. 17, 2014 Decree of Divorce, 41.)

## II. ASSIGNMENTS OF ERROR

{¶ 19} Appellant assigns three assignments of error for our review:

[1.] The Trial Court Erred As A Matter Of Law In Its Calculation Of Appellant's Income And, Correspondingly Its Calculation Of Spousal Support, By Utilizing Assets From Appellant's Closely Held Corporation To Determine Its Value And, Then, Also Including Those Same Assets As Part Of Appellant's Income For Support Purposes In Violation Of *Heller v. Heller*, 10th Dist. No.07AP-871, 2008-Ohio-3296.

[2.] Appellee's Adjusted NAV Of The Business Was So Fundamentally Flawed That The Trial Court's Reliance Upon It Constitutes An Abuse Of Discretion.

[3.] The Trial Court Erred And Acted Against The Manifest Weight Of The Evidence When It Allocated To Appellee $10,461 Of Vehicle Insurance Proceeds Where Those Proceeds Had Already Been Included In The Value Of The Business, Thereby Double Counting An Asset.

{¶ 20} Appellee assigns one assignment of error for our review:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FAILED TO AWARD ATTORNEY FEES TO WIFE.

## III. DISCUSSION

### A. First Assignment of Error

{¶ 21} Under his first assignment of error, appellant contends the trial court erred in its calculation of spousal support by using the same cash and accounts receivable to

calculate appellant's income for purposes of spousal support and to value appellant's business for purposes of the marital property division, resulting in a "double dip" in violation of R.C. 3105.171(A) and *Heller I*. Appellant suggests the trial court should have made an adjustment to appellant's income in 2014 to nullify the double dip attributed to the accounts receivable. Appellee responds that appellant's arguments fail under R.C. 3105.18(C)(1)(a), *Gallo v. Gallo*, 10th Dist. No. 14AP-179, 2015-Ohio-982, and even under *Heller I* itself.

{¶ 22} R.C. 3105.18 generally defines "spousal support" as payments "both for sustenance and for support of the spouse or former spouse," a definition which does not include payments "made as part of a division or distribution of property or a distributive award under section 3105.171 of the Revised Code." Under R.C. 3105.18(C), a trial court may determine spousal support is appropriate and reasonable and set the nature, amount, and terms of payment, as well as the duration of the support, only after considering:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be a custodian of a minor child of the marriage, to seek employment outside the home;
>
> (g) The standard of living of the parties established during the marriage;
>
> (h) The relative extent of education of the parties;
>
> (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1)(a) through (n); *Gallo* at ¶ 49. "The trial court must consider all of these factors; it may not base its decision regarding spousal support on any one factor in isolation." *Id.*, citing *Kaechele v. Kaechele,* 35 Ohio St.3d 93, 96 (1988).

{¶ 23} An appellate court will not reverse a trial court's determination as to spousal support absent an abuse of discretion. *Id.*, citing *Havanec v. Havanec*, 10th Dist. No. 08AP-465, 2008-Ohio-6966, ¶ 23. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 24} In *Heller I*, this court addressed the issue of "double dipp[ing]" in the context of "excess earnings"—those distributions to the husband based on his share of the company's future profits. *Heller I* at ¶ 21. The husband in *Heller I* owned an interest in a company from which he received yearly distributions in addition to his regular salary. In valuing the husband's interest in the company for purposes of dividing marital property, the trial court adopted an expert valuation which used a discounted cash flow[1] income-based method. Under this method, the business was valued based on a future income stream which included the distributions. In its martial property division, the trial court

---

[1] *See Gallo* at fn. 1.

awarded half of that value to the wife. In addition, the trial court ordered that the wife should receive, as spousal support, an additional 20 percent of the future distributions that the husband actually received from the company in the future.

{¶ 25} On appeal, we determined that, "in cases where one spouse's ownership interest in a going concern is discounted to present value and divided, and where excess earnings arising from that ownership interest will constitute part of that spouse's stream of income into the future," a trial court must consider the potential "double dip." *Id.* at ¶ 21. Within this context, we stated that "[t]rial courts may treat a spouse's future business profits either as a marital asset subject to division, or as a stream of income for spousal support purposes, but not both." *Id.* at ¶ 23. Thus, we found the trial court double dipped when it awarded part of the same asset—the husband's share of the company's expected future profits—to the wife twice, constituting an abuse of discretion.

{¶ 26} Later, in *Gallo*, this court conducted an expansive analysis of double dipping. In doing so, *Gallo* discussed the general definition of a double dip and, if a double dip occurs, the resulting discretion imparted on the trial court in adjusting marital property and spousal-support awards.

{¶ 27} First, "a double dip occurs when a court twice counts a *future income stream*—once in valuing the marital asset and once in deciding the economically superior spouse's ability to pay spousal support. It is the future income stream, not the marital asset, that is the subject of the doubling in the double dip." (Emphasis sic.) *Gallo* at ¶ 18. Because the "hallmark necessary for the danger of double dipping to arise" is a business valuation derived from its future income stream, generally no double dip occurs if the business is valued through a market-based or asset-based approach. *Id.* at ¶ 26. *See also Eddington v. Eddington*, 10th Dist. No. 14AP-572, 2015-Ohio-1233, ¶ 8 (finding *Heller* "inapposite" where, in making a division of martial property, the trial court did not use the discounted present value of the husband's future share in company profits); *Bohme v. Bohme*, 2d Dist. No. 26021, 2015-Ohio-339, ¶ 28 ("Surely, if the business value were arrived at by using one of the other two methods of valuation—the market approach * * * or the asset approach—no one reasonably would assert that [the husband's] income [from a closely-held dental business] was counted twice."); *Sieber v. Sieber*, 12th Dist. No. CA2014-05-106, 2015-Ohio-2315, ¶ 57 (finding double-dipping argument "inapplicable"

to trial court's property award of 50 percent of husband's stock in a company and spousal-support award of 40 percent of the husband's future shareholder distributions, where the husband's minority shareholder interest was valued using an asset-based method).

{¶ 28} Second, "in the interest of equity, trial courts should factor the impact of double dipping into their property division and spousal support decisions." *Gallo* at ¶ 33. No outright prohibition of double-dipping exists.[2]  *Id.* at ¶ 32 ("R.C. 3105.18(C)(1)(a) precludes us from adopting an outright prohibition of double dipping.").  *See also Heller v. Heller*, 10th Dist. No. 10AP-312, 2010-Ohio-6124, ¶ 8 ("*Heller II*") ("In [*Heller I*], there was no language in our decision to suggest that this court intended to promulgate a flat prohibition against double dipping applicable to every income-producing asset; rather, this court addressed the 'double dip' issue only as it applies to the facts of this case.").

{¶ 29} Third, the "trial court has discretion regarding if and how to remedy the double dip, and such decisions will turn upon the facts and circumstances of each particular case." *Gallo* at ¶ 34.  For example:

> A trial court may ameliorate the inequity inherent in double dipping by splitting the income-producing asset at issue between the parties, thus ensuring that each spouse will share in advantages and disadvantages associated with that asset. Alternatively, a trial court may determine that some circumstances, such as the disparity in income between the parties, override the unfairness in double dipping.

*Id.*

{¶ 30} Appellant's first argument under this assignment of error contends a double dip occurred because the trial court calculated appellant's earnings for spousal support purposes based in part on business cash—the business checking account and deposited funds—and accounts receivable that had already been divided in marital property.  We disagree.

{¶ 31} Appellant's argument is premised on inclusion of the same business cash and accounts receivable in both the valuation of the business for purposes of the award of martial property and in appellant's income for purposes of spousal support.  Exhibit 8

---

[2] Although *Eddington* at ¶ 7 cites the passage in *Heller I*, which *Gallo* overruled, it does so as dicta and is therefore of no effect.  As discussed, the facts of *Eddington* rendered *Heller* "inapposite" in resolving its issue.  *Eddington* at ¶ 8.

shows that the business cash and accounts receivable were certainly included in Russell's business evaluation, and appellant does not dispute this inclusion alone was not in error.

{¶ 32} However, whether the same cash and same accounts receivable were included in Russell's income average for appellant is not apparent. Russell based his income calculation on earnings,[3] which he testified bore little relationship with accounts receivable. Appellant argues that Russell's testimony stating "[s]o even after distributions in 2013, we saw on the balance sheet for the evaluation that there was still, I think, either $61,000 or $67,000 worth of cash still sitting on the company balance sheet" proves that business cash, which was divided as part of the business value, was then included in estimating 2013 income. (Tr. 96.) However, our review of the transcript shows Russell's comment referred to his evaluations of hypothetical distributions, as a comparison point to the actual earnings he used and which did not consider cash as a line item. Further, Russell's income estimate was not based on 2013 alone but averaged three years of earnings. The average used, $254,973, is $90,000 less than the 2013 net earnings. From this record, we cannot determine that the cash and accounts receivable included in the business valuation were also included in appellant's average income for purposes of the spousal-support award. Therefore, because appellant's assignment of error is based on the assumption that the trial court included the same cash and accounts receivable in both the marital property and the spousal-support award, appellant has not demonstrated error.

{¶ 33} Moreover, even if we were to assume the 2013 sales included those accounts receivable used in the business valuation and assume a portion of those accounts receivable were not eliminated through Russell's three-year average, appellant's argument still fails. Under Ohio law, to determine a spousal-support award, the trial court must consider the income of the parties, *from all sources.* R.C. 3105.18(C). Thus, in a divorce where a spouse owns a business, merely considering the same assets in both a business valuation and in an income evaluation is not in error and is likely unavoidable. As stated in *Gallo*, the danger of a double dip arises only when a court twice counts a *future income stream*, which asset-based evaluations like the one utilized here avoid.

---

[3] Appellant notes that pre-tax earnings flow to appellant in a single-member LLC.

{¶ 34} Nonetheless, appellant analogizes the accounts receivable utilized in Russell's December 31, 2013 business valuation to "future business profits," or "a future stream of income" akin to that considered by *Heller I* and *Gallo*, and denies that an asset-based business valuation precludes a double dip in these circumstances. (Appellant's Brief, 15, 19.) In doing so, appellant relies on a case out of Wisconsin, *Hubert v. Hubert*, 159 Wis.2d 803 (Ct.App.1990), for the proposition that accounts receivable are future income streams for purposes of a double-dipping analysis.

{¶ 35} We find *Hubert* unpersuasive. *Hubert* operated under the Wisconsin rule which, at the time, prohibited any account receivable from being classified as both an asset under a marital property division and as anticipated income subject to spousal support. *Gallo* rejected such a blanket prohibition on double dipping, as did the Wisconsin Supreme Court in *Cook v. Cook*, 208 Wis.2d 166, 180 (1997). Further, it is unclear from the test of *Hubert* whether the court was considering only the accounts receivable on hand, future accounts receivable, or both.

{¶ 36} Our research does not readily supply an exact definition of "future income streams," but Ohio case law suggests the phrase refers, in the double-dipping context, to the projected, ongoing value of an asset. *See Gallo* at ¶ 20-27 (discussing "prospective" income streams and naming "pensions, business and professional goodwill, and dividend-yielding stock" as types of assets that produce "future income streams"); *Bohme* at ¶ 28-33 (discussing the general inapplicability of the double-counting framework beyond certain ongoing future income streams such as pensions and annuities). *See also Kellam v. Bakewell*, 6th Dist. No. E-13-032, 2014-Ohio-4635, ¶ 24, *appeal not allowed*, 142 Ohio St.3d 1465, 2015-Ohio-1896, ¶ 24 (finding the trial court did not double dip when it applied the value of the husband's law firm in the division of marital property and utilized the same value in the determination of spousal support where the spousal-support award was based on the husband's income in general, rather than based on assigning the wife part of the ongoing value of that specific asset).

{¶ 37} Regarding accounts receivable as a future income stream, in a post-*Gallo* case considering a *Heller I* double-dipping issue set in the context of an asset-based valuation, the court in *Sieber* treated the accounts receivable included in that asset-based valuation as present, rather than future, income. *Id.* at ¶ 57 ("The trial court did not

consider the future benefits or potential future income stream from the ownership" when it adopted an asset-based business valuation that included the company's accounts receivable. "Rather, the court considered the present, fixed assets of the [company]."). This result aligns with the "future income streams" envisioned as heralds of a double-dipping danger in *Gallo* and *Heller I.* *See Gallo* at ¶ 20-27; *Heller I* at ¶ 22; *Bohme* at ¶ 28-33.[4] *See also Skrabak v. Skrabak*, 108 Md. App. 633, 653 (1996) ("The accounts receivable held by the corporation at the time of the trial were fees that had already been earned and can be called 'future income' only in the sense that they will be collected in the future.").

{¶ 38} Considering the foregoing, we find the accounts receivables which Russell included as adjustments in his asset-based business valuation to not constitute "future income streams" for purposes of the double-dipping analysis here. In other words, on December 31, 2013, the specific amounts of cash and accounts receivable used in Russell's valuation were *present* assets of company, not *future* income or earnings in the sense discussed by *Heller I* or *Gallo*. Therefore, under *Gallo* and considering the facts of this case, even if the record could establish that the same cash and accounts receivable were actually considered twice, no double dip occurred.

{¶ 39} Accordingly, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 40} Under his second assignment of error, appellant asserts that the trial court erred in valuing the business by relying on a flawed adjusted net asset value. In divorce proceedings, a trial court's valuation of marital property, including valuation of a business determined to be marital property, will not be overturned by an appellate court absent an abuse of discretion. *Gallo* at ¶ 42; *Lee v. Lee*, 5th Dist. No. 2008 CA 112, 2009-Ohio-5250, ¶ 100.

---

[4] In *Bohme*, the court doubted the applicability of double dipping in the context of closely held business, particularly where a spouse is a sole owner of a business who has complete control over the business's retained earning to support the parties' lifestyle. *Bohme* at ¶ 25, 28 ("The double-counting analytical framework * * * is not as easily applied for suggesting that income from a closely-held business, particularly a wholly-owned professional practice, is counted twice when that income is considered as a tool to value the business and then as actual income for a spousal-support calculation. * * * Although income retained by the business was utilized to arrive at a fair-market value, that does not mean the business income was 'counted' against [the husband]. It was just the method used to arrive at the business's fair-market value.").

{¶ 41} First, appellant argues that under R.C. 3105.171(F)(6), the trial court erred in not considering the resulting increase in taxes that will result by adding back the pre-paid expenses. R.C. 3105.171(F)(6) states that, "[i]n making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider * * * [t]he tax consequences of the property division upon the respective awards to be made to each spouse." R.C. 3105.171(F)(6) requires the trial court to consider the tax ramifications of the awards upon each spouse. It does not require the trial court to independently examine the tax consequences of adjustments to an expert's business valuation. Nor would the trial court here have had evidence to do so: although appellant contends the business had enjoyed tax benefits or a deduction from pre-paying these expenses, he does not point to record evidence showing what that benefit would be.

{¶ 42} Appellant's second argument, which contends Russell failed to consider and incorporate pre-paid expenses from previous years, likewise fails due to a lack of record evidence. Although Ferguson testified that he understood the business to have historically pre-paid taxes each year, he also admitted, and our review shows, that record evidence does not support this claim.

{¶ 43} Appellant's third argument proposes that Russell's asset-based valuation is unreliable because he did not obtain appraisals of the business assets, visit the buildings, or talk to appellant or his business accountant. Although appellant states that the "fundamental concept" that asset valuations require the fair-market value of the assets, he does not cite any authority for his argument, a perquisite to establishing reversal error. *See White v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-927, 2013-Ohio-4208, ¶ 11; *Cantrell v. Deitz*, 10th Dist. No. 12AP-357, 2013-Ohio-1204, ¶ 33; App.R. 16(A)(7). Further, although our independent review of the record shows Ferguson generally discussed the need for fair-market value appraisals in asset-based valuations of businesses, he also acknowledged the accuracy of Russell's calculations and methodology and noted difficulties in divorce cases in obtaining business site visits. Russell specifically discussed his decision to not appraise the equipment and testified that an appraisal would not produce results greater than the balance sheet values in this case. At trial, appellant

did not contest the equipment values used by Russell or otherwise provide evidence that the fair-market values of the equipment differed from Russell's assessment.

{¶ 44} For all of the above reasons, and in light of this record, the trial court did not act unreasonably, arbitrarily, or unconscionably in relying on Russell's adjusted net asset business valuation. Accordingly, the second assignment of error is overruled.

### C. Third Assignment of Error

{¶ 45} Under his third assignment of error, appellant asserts that the trial court erred in allocating the car insurance proceeds to appellee when those proceeds had already been included in the dental business valuation and divided between the parties.

{¶ 46} "In divorce proceedings, a trial court must divide marital property equally or, if an equal division is inequitable, equitably." *Gallo* at ¶ 42, citing R.C. 3105.171(C)(1); *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 5. A trial court has broad discretion in the allocation of marital assets, and an appellate court will not disturb a trial court's judgment absent an abuse of discretion. *Gallo* at ¶ 42.

{¶ 47} Appellant's assignment of error presupposes that the insurance proceeds were divided as a part of the business. Record evidence shows the insurance proceeds were deposited into appellant's business checking account on July 11, 2013, Russell's business valuation included the balance of the business checking account on December 31, 2013, and the trial court divided the value of the business between the parties and allocated insurance proceeds to appellee. However, no record evidence establishes that the car insurance proceeds, which related to appellant's daughter's personal use of the 2007 Mercedes, remained in the business checking account. Appellant testified to having no knowledge of the whereabouts of the insurance proceeds, and his CPA testified that, as standard practice, she withdrew money from appellant's business checking account for deposit in his personal checking account. Under these facts, the trial court did not act unreasonably, arbitrarily, or unconscionably in allocating the insurance proceeds to appellee to achieve an equal or equitable result.

{¶ 48} Accordingly, appellant's third assignment of error is overruled.

### D. Cross-Assignment of Error

{¶ 49} In her sole assignment of error, appellee asserts the trial court erred when it failed to award attorney fees under the equitable parameters outlined in R.C. 3105.73(A).

Specifically, appellee argues that appellant's conduct throughout the trial and divorce resulted in substantially increased litigation costs and expenses for appellee, and the disparity between the ultimate spousal-support award and temporary spousal-support award gave appellant a greater ability to pay his attorney fees during the divorce.

{¶ 50} R.C. 3105.73(A) provides:

> In an action for divorce * * * of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 51} Award of attorney fees in domestic relations actions is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Chattree v. Chattree*, 8th Dist. No. 99337, 2014-Ohio-489, ¶ 79.

{¶ 52} Regarding appellant's conduct, appellee asserts that he took unreasonable positions on issues, was evasive and difficult throughout the entirety of the divorce process, and refused to be forthright before the court, which required unnecessary extra time and money to resolve the case.

{¶ 53} An independent review of the record supports appellee's contention that appellant was evasive and contradictory and evidences the trial court's frustration and warnings in response to such behavior. However, in its decision, the trial court considered this behavior and ultimately determined that it was not of such an intentionally dilatory character to warrant a fee award on the basis of conduct, particularly because the court recognized that appellant conceded several major points, such as custody, a guideline order of child support, and an award of spousal support in general. On these facts, we cannot conclude the trial court abused its discretion in declining to award attorney fees to appellee on the basis of conduct.

{¶ 54} Regarding the spousal-support awards, the trial court expressly discussed the amount of the temporary spousal support, the final spousal-support award, and appellant's various failures to pay amounts owed to appellee throughout the divorce process. It is unclear whether the trial court specifically considered the disparity between

the temporary and final spousal-support awards and the resulting impact on the parties' ability to pay attorney fees during the divorce.  However, appellee offers, and we find, no authority requiring a trial court to do so.  In fact, based on the express language of R.C. 3105.73(A), the trial court has the discretion to not consider temporary spousal support at all.  Therefore, even if the trial court failed to address the disparity between the temporary and final spousal-support award, no error occurred.

{¶ 55} Accordingly, appellee's cross-assignment of error is overruled.

## IV.  CONCLUSION

{¶ 56} Having overruled appellant's assignments of error and overruled appellee's cross-assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

BROWN, P.J., and LUPER SCHUSTER, J., concur.

_____